**STATE of Tennessee, Appellee,**

v.

**Kendall PHILLIPS, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Feb. 22, 1984.

Permission to Appeal Denied April 30, 1984.

Robert R. Simpson, Knoxville (On appeal only), Douglas R. Beier, Morristown (At trial only), for appellant.

William M. Leech, Jr., Atty. Gen., Wayne E. Uhl, Asst. Atty. Gen., Nashville, Charles Berkeley Bell, Dist. Atty. Gen., Jim Pryor, Asst. Dist. Atty. Gen., Greeneville, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of murder in the second degree and was sentenced to serve twenty-five years in the state penitentiary. On appeal he has presented two issues for our consideration.

In the first issue the appellant contends that he was denied due process of law and effective assistance of counsel, because his former defense counsel actively participated in the prosecution of the case on behalf of the state. In the second issue he challenges the sufficiency of the convicting evidence, specifically the sufficiency of the evidence that he was sane at the time of the crime.

In a motion to dismiss, the appellant asserted that the case should be dismissed because his former defense counsel, Edward R. Sempkowski, is now an Assistant District Attorney General, and that, after having served as his counsel, Mr. Sempkowski worked on the appellant's case for the prosecution.

The appellant killed his wife on August 30, 1981, and was arrested immediately thereafter at the scene. His family retained Mr. Sempkowski to represent the appellant.

On September 30, 1981, Mr. Sempkowski filed a motion for mental evaluation to determine the appellant's mental capacity at the time of the offense and his competency to stand trial. In support of this motion, defense counsel filed an affidavit wherein he stated, "I have interviewed the defendant in the county jail on numerous occasions and have ascertained that the defendant was undergoing treatment at the Cherokee Mental Health Center several weeks prior to August 30, 1981". He further swore that, "I have interviewed the defendant and other sources and have learned that defendant wrote a series of letters or notes which may be classified as 'suicide notes' on or about the day of the shooting". He further asserted that "I have interviewed the defendant and other sources and have ascertained that the defendant attempted suicide on the day of the shooting". Finally, he swore that "I have interviewed the defendant and other sources and have ascertained that defendant has talked of suicide since his incarceration at the Hamblen County Jail".

On October 7, 1981, the motion came on for hearing and the trial judge ordered the evaluation of the appellant. Mr. Sempkowski represented the appellant at the hearing and approved the order for entry.

On the same date the grand jury returned an indictment against the appellant charging him with murder in the first degree.

A week later Mr. Sempkowski filed a motion for discovery, a motion for a continuance, a motion for the release of all medical evaluations, reports and notes in the possession of the Cherokee Mental Health Center, and a notice that the appellant intended to rely on the defense of insanity.

On October 26, 1981, Mr. Sempkowski filed a motion for further mental health evaluation, and this matter was heard two days later, at which time the trial judge ordered the appellant transferred to the Middle Tennessee Mental Health Institute for further evaluation. According to the record, Mr. Sempkowski participated in this hearing and approved the order for entry.

Subsequently, on December 19, 1981, Mr. Sempkowski filed a petition for the appellant's judicial hospitalization. Then, on December 29, 1981, he filed a motion seeking a transfer of the appellant to the Lakeshore Mental Health Institute pending a hearing. In support of this motion, he filed another affidavit, wherein he related that the appellant had told him that "his medication is becoming less effective", and further that "since the defendant returned to the Hamblen County Jail, I have observed that Mr. Phillips has developed increasing anxiety and nervousness".

On December 30, 1981, another notice was filed by Mr. Sempkowski that the appellant would rely on an insanity defense. That same day he also filed a waiver of trial by jury on the issue of whether the appellant should be judicially hospitalized.

A hearing was held the next day on the issue of judicial hospitalization of the appellant, and the trial judge committed him to the Forensic Services Division of the Middle Tennessee Mental Health Institute pending his recovery. Mr. Sempkowski participated in this hearing and approved the order for entry.

From that point on all pleadings are signed by other counsel. First, Beverly C. Sullivan represented the appellant until she discovered an ethical problem which required her to move for and be granted the right to withdraw. Douglas R. Beier was then appointed to represent the appellant. Yet, as late as June 21, 1982, the Middle Tennessee Mental Health Institute sent a copy of correspondence with the trial judge to Mr. Sempkowski as defense counsel. No order relieving Mr. Sempkowski as counsel appears in the record, and apparently he was never relieved.

When the motion to dismiss was heard, it was admitted that Mr. Sempkowski was then employed by the District Attorney General and that he had worked on the appellant's case for his new employer. His work was termed "clerical" by the trial judge who denied the motion and allowed

the District Attorney General and his staff to proceed with the prosecution.

Although counsel were not sworn to testify at the hearing on the motion, the District Attorney General, Berkley Bell, announced that Mr. Sempkowski had participated in the obtaining of a medical expert to testify on behalf of the state. Mr. Sempkowski admitted that he did this and also that he let the expert look through the state's file. Mr. Bell further announced that Mr. Sempkowski had told him that the state had found the appellant insane while he represented him. Mr. Sempkowski admitted that he filed a motion asking the Court to direct that the appellant be examined by the state's expert and that he signed Mr. Bell's name to the motion.

Copies of the Federal Bureau of Investigation Ballistic Report and the autopsy report revealed that Mr. Sempkowski had worked on the case for the prosecution by penciling notes on both reports.

Mr. Sempkowski told Ms. Sullivan as she was reviewing the appellant's employment records from the Tennessee Valley Authority that the employment records would be used to show that the appellant handled dynamite. Mr. Sempkowski admitted that he had looked at the appellant's employment records one time. On behalf of the state, Mr. Sempkowski complied with discovery by giving various items to Ms. Sullivan. He also talked to an employee of the Cherokee Mental Health Center regarding a subpoena duces tecum which, according to Mr. Sempkowski, a secretary had had issued. He further admitted that he may have told the secretary to subpoena the hospital records from Nashville.

After the motion to dismiss was overruled, an application for an interlocutory appeal was filed under Rule 9, T.R.A.P. The record does not reveal that the motion was ever presented to the trial judge as required by Rule 9(a), T.R.A.P.

Subsequently, the case proceeded to trial and the appellant was convicted. A timely motion for a new trial was filed. Attached to the motion for a new trial was an affidavit from the appellant's brother concerning a fee dispute which arose with Mr. Sempkowski after he discontinued his representation of the appellant. In addition, a letter from the Chief Disciplinary Counsel of the Board of Professional Responsibility and a copy of Mr. Sempkowski's response to the complaint filed against him was attached to the affidavit. The motion for a new trial made a general reference to the affidavit and letter, but they were not introduced as evidence at the hearing on the motion. A brief reference was made to the documents at the hearing. The trial judge did not specifically state that he considered the affidavit, but stated that he was sure that Mr. Sempkowski spent a lot of time and did a lot of work on the case when he was defense counsel.

In denying the motion for a new trial, the trial judge reiterated his earlier finding that Mr. Sempkowski only performed "clerical" tasks. However, he reversed his previous finding that Mr. Sempkowski deserved a "rebuke and a reprimand" and found that Mr. Sempkowski "remained aloof from the case and ... his presence has been one of an honorable position in the case". He further found that "every precaution was taken that could be taken, and that the defendant wasn't prejudiced thereby".

Both the appellant and the state rely on *Autry v. State,* 1 Tenn.Cr.App. 95, 430 S.W.2d 808, 809 (1967). In that case this Court stated:

It has long been firmly established, both in the Canons of Professional Ethics and by judicial opinions, that attorneys cannot represent conflicting interests or undertake to discharge inconsistent duties. When an attorney has once been engaged and received the confidences of his client, he cannot enter the services of those whose interests are adverse to that of his client or former client. The rule is a rigid one, and it is well that it is so. An attorney cannot be permitted to participate in the prosecution of a criminal case if, by reason of his professional relation with the accused, he has acquired knowledge of facts upon which

the prosecution is predicated, or which are closely interwoven therewith.

In *Autry*, the question was whether the special prosecutor was disqualified because the relation of attorney and client had existed between him and the defendant, and whether he had received confidential communications from the defendant. In that case, defense counsel suggested that the defendant and his co-defendant son employ another attorney to assist in their defense. They went to the attorney's office and discussed employment. The fee was discussed and the attorney offered to represent them for a stated figure. The defendant made a counteroffer and they were unable to agree upon the fee. According to the defendant and his son, they talked for about an hour and disclosed all the facts and witnesses and discussed how the case would be tried.

Three days before the trial, this same attorney was employed by private interests to assist in the prosecution. At that time the lawyer did not recall that Mr. Autry had been to see him and did not recall anything about the case. When the issue was raised at trial, he remembered that the defendant had been in his office, but did not recall whether or not the son was with him. He did remember talking briefly with the defendant about a fee, but said that he did not discuss the details of the case.

Under this conflicting testimony, the trial judge found that the attorney had not discussed the details or facts of the case with Mr. Autry, that no confidential communication had taken place, and that the relation of attorney and client did not exist. He allowed the trial to proceed with the special prosecutor participating. *Id.*

Speaking through Judge Walker, its presiding judge, this Court held that there was no abuse of discretion in permitting the special prosecutor to participate in the trial. As the writer of that opinion noted, "(t)he point presented a delicate question", but noted that the trial judge found that no confidential communications had occurred between Mr. Autry and the challenged counsel. *Id.*, 430 S.W.2d at 810.

Later, in *Mattress v. State*, 564 S.W.2d 678, 680 (Tenn.Cr.App.1977), Judge Walker was again presented with the delicate question of whether there was a conflict of interest on the part of an Assistant District Attorney General who had formerly been a staff attorney at the University of Tennessee Legal Clinic. In his former capacity he accepted a case involving one of the defendants, Mr. Chesney. The charges were accessory to rape and robbery. Mr. Chesney was interviewed by a law student and not by the challenged attorney. Another file from the legal clinic showed that this same attorney was assigned to Mr. Mattress' case involving two counts of armed robbery, which apparently were the offenses for which the defendants were on trial. The attorney did not recall the cases and did not think that he had talked with either of the defendants. In fact, neither defendant claimed to have been interviewed by the attorney or to have divulged any confidential information to him.

After going to work for the prosecutor, this attorney interviewed the state's witnesses and prepared a motion for a continuance.

The trial judge held that the challenged Assistant District Attorney General would not be allowed to participate in the trial, but that another assistant could prosecute the cases. The appellants argued that the judge's action was insufficient to remove any appearance of impropriety.

This Court, relying upon *Autry v. State*, supra, held that there had been no breach of the attorney-client relationship, the privilege against disclosure had been preserved, professional ethics had been painstakingly observed and the constitutional right to a fair and impartial trial was not infringed. Hence, this Court held that there was no error, and that the trial court's action was adequate to dispel any appearance of impropriety. *Mattress v. State*, supra.

In neither of those cases did the defense counsel/prosecutor's actions approach the extensive pre-trial representation by the challenged attorney on behalf of his former

client before changing sides in the litigation. Apparently, the facts of this case present an issue of first impression in Tennessee.

Turning to cases from other jurisdictions, we find cases wherein the facts have a far greater similarity to this case than either of our previous cases. In *People v. Gerold*, 265 Ill. 448, 107 N.E. 165, 175 (1914), the Supreme Court of Illinois held that the trial court improperly allowed an attorney to appear as counsel for the people where he had previously acted as the defendant's attorney in matters which afterward formed the basis of the indictment and the prosecution thereunder. The Court went on to note:

> The rule has long been firmly established that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties. When he has once been retained and received the confidence of a client, he cannot enter the service of those whose interests are adverse to that of his client or take employment in matters so closely related to those of his client or former client as in effect to be a part thereof. (Citing texts) This rule is a rigid one, designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties. He should undertake no adverse employment, no matter how honest may be his motives and intentions. (Citing a case) He owes to his client fidelity, secrecy, diligence, and skill, and cannot take a reward from the other side. He is not, as a general rule, allowed to divulge information and secrets imparted to him by his client or acquired during their professional relation unless authorized to do so by the client himself. (Citing a case) It is the glory of the legal profession that its fidelity to its clients can be depended upon; that a man may safely go to a lawyer and converse with him upon his rights in litigation with absolute assurance that that lawyer's tongue is tied from ever dis-

> cussing it. (Citing a case) This rule has been so strictly enforced that it has been held that an attorney, on terminating his employment, cannot thereafter act as counsel against his client in the same general matter, even though while acting for his former client he acquired no knowledge which could operate to the client's disadvantage in the subsequent adverse employment. (Citing a civil case) If this is the rule in civil cases, the law will not be less strict in criminal proceedings, especially as to the duty in this regard resting upon counsel for the state. Such an officer is acting in a quasi judicial capacity, and he and those associated with him should represent public justice and stand indifferent as between the accused and any private interest. It is as much the duty of prosecuting attorneys to see that a person on trial is not deprived of any of his statutory or legal rights as it is to prosecute him for the crime with which he may be charged. (Citing a case) ... An attorney cannot be permitted to assist in the prosecution of a criminal case if by reason of his professional relations with the accused he has acquired a knowledge of the facts upon which the prosecution is predicated or which are closely interwoven therewith. (Citing cases) ... It is unnecessary that the prosecuting attorney be guilty of an attempt to betray confidence; it is enough if it places him in a position which leaves him open to such charge; .... 107 N.E. at 177.

In *Steeley v. State*, 17 Okl.Cr. 252, 187 P. 821, 824 (1920), the prosecutor had appeared for the defendant at the preliminary hearing and moved for a continuance. He appeared only as an accommodation for the defendant's employed counsel who was sick at the time. The attorney advised the defendant to waive the preliminary examination and did so on the defendant's behalf. The Court found that upon these facts "the relation of attorney and client existed between (the lawyer) and the defendant". The Court further found that the fact that the attorney received no compensation

from the defendant was immaterial. The Court found that, having appeared for the defendant and represented him at the preliminary proceeding, the attorney was disqualified from acting in any way as a prosecutor. The Court found that the trial court should have appointed some suitable person to act as prosecutor under the applicable Oklahoma statute.

In *State v. Burns,* 322 S.W.2d 736, 740 (Mo.1959), the Prosecuting Attorney, who had formerly been a practicing attorney, interviewed the defendant in the jail and was employed as defense counsel. Later, the defendant consulted the attorney at his office and the attorney wrote a rather lengthy statement of the facts, outlining the defendant's version of the affair. The attorney " 'discontinued' defendant's representation", but, like the attorney in this case, filed no withdrawal. The appellate court outlined the various actions taken by the attorney after he took office as Prosecuting Attorney, many of which were "clerical" and some of which involved court appearances on behalf of the prosecution.

In *Burns,* the state argued that no prejudice had been demonstrated, that the prosecutor "took only a minor part" and that no objection to his conduct was made at the times in question. 322 P.2d at 741.

The Missouri Supreme Court reversed and remanded, noting that this was "something more than a question of technical error". According to that Court, "this matter directly affects the conduct of the bar and the administration of criminal justice, as well as the basic rights of the defendant. In matters directly affecting the public interest, the courts sometime raise certain questions 'ex mero motu' " (voluntarily and without prompting or request). *Id.*

On the question of prejudice, the Supreme Court noted that "it is impossible to tell precisely how active (the former defense attorney) may have been in the prosecution, or whether the information he procured from the defendant played any part therein, directly or indirectly. But the very fact that he had acquired that information as counsel for the defendant, and that he

might use it, renders his subsequent position wholly untenable". *Id.* The Court further held that it would not "attempt to weigh or measure the actual prejudice in a case of this kind", a more specific showing of prejudice being unnecessary. "The acts were such as to infringe upon the generally recognized concepts of proper conduct of prosecuting officials." Prosecuting officials, like Caesar's wife, "ought to be above suspicion". 322 S.W.2d at 742.

In *State v. Detroit Motors,* 62 N.J.Super. 386, 163 A.2d 227, 231 (1960), the Court, citing *Ward v. State,* 33 Okl.Cr. 182, 242 P. 575, 576 (1926), noted that the rule which prevents defense counsel from changing to the prosecution side involves the principle that one cannot serve two masters. *See:* Matthew 6:24.

In the words of the Oklahoma court, "(c)ourts have a duty to themselves, to the public, and to the legal profession. The due and orderly administration of justice, the honor of the legal profession, and the dignity of the court forbid such practice".

In *Detroit Motors,* the court noted that these rules "appear to be inviolate regardless of intent or motive. This is apparently so, because in any given case, except a very unusual one, it would not be possible for the defendant to prove any such breach of confidence or resulting prejudice". *Id.*

In *Young v. State,* 177 So.2d 345, 346 (Fla.App.1965), the court noted on due process grounds that "when an attorney has had dealings with a defendant as a defense counsel and later becomes a prosecutor in the same case, a conviction thereby obtained must be reversed". In such a situation, the defendant is "deprived of the substance of a fair trial and due process". 177 So.2d at 347.

In *People v. Rhymer,* 32 Ill.App.3d 431, 336 N.E.2d 203, 204 (1975), the Court noted that, "(i)t is well settled that where an attorney has, through his professional service to a client, acquired confidential information and then later participated *in any way* in the prosecution of the case, reversible error is committed". (emphasis added)

In *State v. Leigh*, 178 Kan. 549, 289 P.2d 774, 777 (1955), the court noted that even though no dishonest purpose was imputed to the attorney in a similar situation, "a conviction under such circumstances, irrespective of the guilt or innocence of the defendant, cannot be permitted to stand".

In *Sharplin v. State*, 330 So.2d 591, 594 (Miss.1976), an attorney had represented a client in a civil matter and then prosecuted the criminal case growing out of the same circumstances. The court found that "the relationship between the civil representation and the criminal prosecution was so substantial and the facts of each so intertwined that no attorney could be expected to lay aside the confidences imparted to him during the civil suit and proceed with a criminal prosecution of his former client without violating the legal and ethical obligations owed to the former client". The court noted that while the attorney made earnest efforts to avoid a conflict of interest, his participating as a prosecutor in the defendant's trial was reversible error.

In *State v. Britton*, 157 W.Va. 711, 203 S.E.2d 462, 466 (1974), the prosecutor never acted as the defendant's counsel, but held gratuitous consultations with the defendant. The court held that "a prosecuting attorney should not be permitted to participate in a criminal case if, by reason of his professional relations with the accused, he has acquired any knowledge of facts upon which the prosecution is predicated or closely related". The court found that "it cannot be said with certainty" that the information derived from the voluntary meeting between the prosecutor and the defendant did not contribute to the defendant's conviction. The prosecutor "could have" gained a possible advantage over the defense from the meeting. Further, the state, "cannot show that the error was harmless beyond a reasonable doubt or that there was no reasonable possibility that the error complained of might have contributed to the conviction". 203 S.E.2d at 467.

The state relies upon several cases for the principle that a per se rule is inappropriate and that courts must look to determine if the defendant was prejudiced. All of those cases are distinguishable from this case.

In *Hannon v. State*, 48 Ala.App. 613, 266 So.2d 825, 826 (Ala.Cr.App.1972), defense counsel sought a dismissal because the District Attorney General, prior to his election to that office and while associated with the Public Defender's Office, was, along with two other Public Defenders, assigned to represent Mr. Hannon. However, the proof showed that the District Attorney General had not discussed that case with his assistant who was in charge of the prosecution, and that he had not even mentioned this case or any other case that he had handled while associated with the Public Defender's Office to any of the personnel of his office. In fact, the District Attorney General wasn't even aware that Mr. Hannon's case was on trial until the judge sent for him and he went into the courtroom. 266 So.2d at 827. In that case the appellate court held that there had been no breach of the attorney-client relationship, the privilege against disclosure had been preserved, and professional ethics were painstakingly observed. 266 So.2d at 829.

The state relies upon *Pisa v. Commonwealth*, 378 Mass. 724, 393 N.E.2d 386, 387–388 (1979). In that case the lawyer in question, while a law student, worked as a research assistant for the defendant's counsel and prepared a memorandum of law in support of the motion for a new trial. After passing the bar examination, he joined the office of the district attorney and informed those in charge that there were certain cases in which he could not write briefs, including *Pisa*. Almost two years later, another assistant district attorney asked the lawyer to proofread the Commonwealth's appellate reply brief to check for typographical and grammatical errors and to check citations. He did so, but he provided no confidential information, did no research and made no changes.

The judgment was affirmed, but the court indicated that "(w)e in no way condone the conduct of the prosecution" in

that case. The court noted that the lawyer should not have been asked "to perform any task in connection with the brief", and that he should have "refrained from any participation in the appeal", but the court noted that his participation was minimal and resulted in no harm to the defendant. 393 N.E.2d at 390.

Yet, in *Pisa*, the court noted that "(w)hen the impropriety is a conflict of interest on the part of a defendant's trial counsel, it may be impossible to identify from the record the resulting prejudice". "In such a case, inquiry by an appellate court into prejudice would require 'unguided speculation' ". 393 N.E.2d at 389. Therefore, "when a defendant has asserted that his trial was infected by such a conflict of interest, we have required only that he establish the existence of a genuine conflict". If the conflict is demonstrated, prejudice is presumed. 393 N.E.2d at 389.

In *Pisa v. Streeter*, 491 F.Supp. 530, 534 (D.C.Mass.1980), the unsuccessful defendant in *Pisa v. Commonwealth*, supra, sought habeas corpus relief. The federal court differentiated between counsel's action in connection with the appeal and a conflict of interest by trial counsel. The court notes that "(i)n the trial setting, prejudice is *presumed* when a criminal defendant demonstrates that a conflict of interest actually affected the adequacy of his representation". (emphasis in original)

In *Upton v. State*, 257 Ark. 424, 516 S.W.2d 904, 906 (1974), the defendant sought to quash the indictment because a former counsel had switched sides after a former trial and appeal. The court noted the challenged counsel's prior contact with the defendant had consisted principally of legal research and briefing. After changing sides he had never reviewed the state's file or done anything to become involved in any way in the case. The trial court allowed the prosecution to proceed, but enjoined the attorney from any participation even as a spectator. The Supreme Court of Arkansas affirmed the lower court's judgment. However, the court noted that "(i)f (the defense counsel/prosecutor) had appeared in the case at any time on behalf of the state in any capacity or prepared, presented or argued charges against the appellant or instructions to be given the jury, or had communicated with the prosecuting attorney or any member of his staff about the case or had been a partner of the defense counsel serving at the second trial, we would have an entirely different situation". 516 S.W.2d at 907.

In *State v. Bell*, 346 So.2d 1090, 1099–1100 (La.1977), the defendants sought the recusal of the entire District Attorney's Office because one of the attorneys who represented the defendants in the first trial had since joined the staff of the District Attorney as an assistant. There was no evidence of any activity by this attorney in connection with this particular case. Hence, the court held that the fact that an Assistant District Attorney previously represented the accused does not *ipso facto* require disqualification of the District Attorney.

An excellent annotation on this delicate subject may be found at 31 A.L.R.3d 953. Our examination of the foregoing cases, those cited in the annotation and others that we have examined revealed no case wherein an appellate court allowed the conviction to stand when the challenged defense counsel/prosecutor did as much for the defendant and the state as the challenged counsel did in this case.

Hence, the conclusion that we must reach in this case is inescapable. The rights of this defendant to a fair and impartial trial and due process of law, the orderly administration of justice, the dignity of the courts, the honor and trustworthiness of the legal profession and the interests of the public at large demand the reversal of this conviction. The courts simply cannot countenance the desertion of the accused by his defense counsel, acceptance of employment with the prosecutor and any subsequent participation in any manner in the trial, including pre-trial preparation. It seems inconceivable that the challenged attorney and his new employer did not know that.

The appellant's retained defense counsel worked with apparent diligence in that capacity and received confidential communications from his client. Although he never sought to properly withdraw, he discontinued his representation of the appellant and went to work as an Assistant District Attorney General. In that capacity, he assisted in the trial preparation by reviewing the state's file, making notes therein, complying with discovery, preparing and filing a motion for the state, interviewing prospective witnesses and obtaining an expert witness to refute the defense he had interposed for the appellant. For this Court or any court to attempt to weigh or measure actual prejudice would require "unguided speculation". A conviction obtained under these circumstances simply cannot stand regardless of prejudice to the accused and regardless of his guilt or innocence.

However, even though the conviction cannot stand, dismissal is not in order. In no case that we have examined has an appellate court reversed and dismissed a conviction because defense counsel switched sides. Rather, in each case, the cause was reversed and remanded for a new trial. *People v. Gerold,* supra, *Steeley v. State,* supra, *State v. Burns,* supra, *State v. Detroit Motors,* supra, *Young v. State,* supra, *People v. Rhymer,* supra, *State v. Leigh,* supra, *Sharplin v. State,* supra, *State v. Britton,* supra.

Therefore, this cause is reversed and remanded for a new trial. The District Attorney General is disqualified from further prosecution of this case. The trial judge is directed to appoint a District Attorney pro tempore to represent the state on retrial. Article VI, § 5, Constitution of Tennessee, TCA § 8–7–106. The record of the first trial will be available to both sides on retrial. The trial judge will insure that the contents of the District Attorney General's file from the time defense counsel was employed is not available to the District Attorney General pro tempore.

In the second issue the appellant challenges the sufficiency of the convicting evidence.

The proof revealed that shortly after 1:00 P.M. on August 30, 1981, at her place of employment, the appellant shot his wife in the back. The victim stumbled to a nearby laundromat where she asked the owner and the patrons therein to summon help for her. The appellant followed her into the laundromat, where, in full view of all those present, he again shot her behind the ear. The appellant positioned himself between the owner of the laundromat and the telephone, and told the owner to call his (the appellant's) ex-wife in Knoxville. The owner complied and both he and the appellant talked to her. The appellant told her that he had just shot his wife. Twice during the conversation with the owner, the appellant said that he was going to kill himself. The owner was able to call the police and when an officer arrived, he found the appellant standing by the Coca-Cola machine holding a cocked .22 caliber revolver. He asked the appellant to put the gun down, but the appellant told the officer that he would have to come and get it. The officer did so.

The only issue in the case was the appellant's sanity at the time of the offense. The appellant presented a psychiatrist, a psychologist and a registered nurse from the Middle Tennessee Mental Health Institute, and a psychologist from the Cherokee Mental Health Center to support his contention that he lacked the requisite mental capacity to conform his conduct to the requirements of the law. *Graham v. State,* 547 S.W.2d 531, 543 (Tenn.1977). In addition, he presented four lay witnesses to support his insanity defense. In rebuttal the state presented five witnesses and Dr. Roger White, the psychiatrist that Mr. Sempkowski obtained to rebut the insanity defense. Dr. White found no mental disease or defect, but only depression, which he termed normal for the appellant's stressful situation. The appellant recalled one of his witnesses in surrebuttal, and the

state then recalled Dr. White in rejoinder. The jury rejected the insanity defense and found the appellant guilty of the lesser included offense of murder in the second degree.

■■■ The issue of whether the defendant was insane at the time of the crime is a jury question. When it has had the advantage of competent testimony, both lay and professional, correct conclusions will be reached. *Id.*, 547 S.W.2d at 543–544. The jury is not bound to accept expert testimony to the exclusion of lay testimony or proof of actions of the accused which are inconsistent with insanity. *Edwards v. State,* 540 S.W.2d 641, 647 (Tenn.1976). They must determine the weight and credibility of all the witnesses in light of all the facts shown in the case. *Id.*

Our review of this case is conducted in the light of clearly recognized principles of appellate review.

■■■ A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

■■■ There was ample evidence from which any rational trier of fact could reject the insanity defense and conclude that the appellant was guilty of murder beyond a reasonable doubt. Rule 13(e), T.R.A.P., *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). This issue has no merit.

Finding merit to the first issue, the judgment is reversed and this cause is remanded for a new trial.

BYERS and CORNELIUS, JJ., concur.