AT NASHVILLE
April 2000 Session

## STATE OF TENNESSEE v. RICKY RAYMOND BRYAN

**Interlocutory Appeal from the Circuit Court for Rutherford County**
**No. F-32368     James K. Clayton, Jr., Trial Judge**

---

**No. M1999-00854-CCA-R9-CD - Filed August 4, 2000**

---

The defendant, facing a third trial for first degree murder, has filed this interlocutory appeal. The defendant alleges that the trial court erred in disqualifying his counsel because of an appearance of impropriety.  We affirm.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and ROBERT W. WEDEMEYER, J., joined.

Guy Dotson, Jr., Murfreesboro, Tennessee, for the appellant, Ricky Raymond Bryan.

Paul G. Summers, Attorney General and Reporter, Todd R. Kelley, Assistant District Attorney, and William C. Whitesell, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Introduction

In January 1995, the Rutherford County Grand Jury indicted the defendant, Ricky Raymond Bryan, for first degree murder.  District Attorney General Guy R. Dotson, Sr., then signed this indictment.  The defendant was convicted as charged by the Rutherford County Circuit Court.  The trial court granted the defendant's motion for a new trial, and he was again tried and convicted of first degree murder.  A panel of this Court reversed that conviction and remanded for a new trial. See State v. Bryan, 990 S.W.2d 231 (Tenn. Crim. App. 1998).  Although the record does not establish the exact date, Dotson, Sr., left office during the pendency of this case.  The defendant has now retained Guy R. Dotson, Jr., to represent him at his third trial.

## Background

Both Dotsons now share office space as attorneys and share a full-page joint advertisement in the Yellow Pages.[1] The advertisement lists the attorneys' names, their areas of legal practice, the office's one telephone number, and represents Dotson, Sr., as a former District Attorney General for the local judicial district. The ad neither explicitly identifies the attorneys as members of a single firm nor defines their practices as separate and discrete. The state introduced this ad in their motion to disqualify Dotson, Jr., from defending the defendant, asserting that "it appears that the defendant is being represented by an attorney who has been joined in practice by that attorney who was responsible for charging that same defendant."

In response to the disqualification motion, Dotson, Sr., executed an affidavit that attests he had already started planning retirement and had been discussing such retirement with the present District Attorney General when the defendant was arrested. He further attested that:

(1) he recalls no contact with the principles of the case and did not actively participate in the prosecution;

(2) he has accepted no employment on any criminal defense case initiated during his tenure as District Attorney General;

(3) he leases office space from his son and both are solo practitioners who share neither fees nor staff;

(4) their files are maintained separately by their respective office staff;

(5) neither attorney has authority to access the other attorney's files;

(6) the two occasionally associate on a case for their "mutual, but separate, benefit";

(7) he has not discussed the substantive facts in this case with his son;

(8) the two attorneys agreed that Dotson, Sr., would not participate in the defense;

(9) from reading newspapers he is aware of the two jury trials and verdicts against the defendant;

(10) he is personally unaware of any of the facts in this case that he could furnish to his son; and

(11) during the two previous trials he neither participated with nor assisted the District Attorney General's office.

The record also comprises the defendant's affidavit acknowledging that Dotson, Sr., was the former District Attorney General, attesting that the defendant believes no conflict exists and, in the alternative, expressly waiving any conflict.

After a hearing, at which no witnesses testified, the trial court concluded that neither attorney had acted or would act in an improper manner but nevertheless concluded that an appearance of impropriety existed. In its "Order Granting State's Motion To Disqualify Counsel," that court specifically expressed concern because the indictment signed by Dotson, Sr., might be read to the jury. The Dotsons now share office space, and the order stated that an appearance of impropriety

---

[1] A copy of that advertisement is attached as an appendix to this opinion.

exists "regardless of the measures taken to insure the ethical obligation to [the defendant]." Therefore, the trial court granted the state's motion to disqualify Dotson, Jr.

Dotson, Jr., then filed a motion for interlocutory appeal, see Tenn. R. App. P. 9, seeking permission to appeal the disqualification. The defendant alleged that "he [would] suffer irreparable injury if he [was] forced to proceed before the resolution of this issue[.]" The motion was granted, and his appeal is now before this Court.

## Analysis

We acknowledge the trial court's conclusion that neither attorney has or would commit any unethical act. We find absolutely nothing to the contrary. However, that conclusion of integrity is not dispositive. The trial court granted the state's motion to disqualify Dotson, Jr., because of an appearance of impropriety, and our opinion addresses that conclusion, rather than the efficacy of the screening mechanism described by affidavit.

## Standard of Review

The instant case apparently presents one of first impression: A district attorney general leaves office and leases office space from a second attorney. Both conduct solo practices at the one office, and they share a common advertisement and telephone number, with occasional mutual participation in cases. That second attorney then seeks to represent a murder suspect whose prosecution began during the tenure of that former district attorney general. We now determine if that representation would create an appearance of impropriety that requires disqualification of the second attorney.

In past cases, our review of a trial court's disqualifying a prosecutor has queried only whether that court abused its discretion. See State v. Tate, 925 S.W.2d 548, 549-50 (Tenn. Crim. App. 1995) ("Typically, the decision to disqualify a prosecutor or his office rests in the sound discretion of the trial judge."); State v. Phillips, 672 S.W.2d 427 (Tenn. Crim. App. 1984). These decisions apparently adopted this standard of review from a prior holding regarding disqualification of a special prosecutor. See Autry v. State, 430 S.W.2d 808, 810 (Tenn. Crim. App. 1967) ("The trial judge did not abuse his discretion in permitting the special prosecutor to participate in the trial."). When facts are essentially undisputed, however, "appellate courts are not required to defer to a trial court's interpretation of the Code of Professional Responsibility or to its decisions regarding legal standards applicable to a particular disqualification motion." John M. Clinard v. C. Roger Blackwood, No. 01A01-9801-CV-00029 (Tenn. Ct. App. filed Oct. 28, 1999, at Nashville) perm. to app. granted (Tenn. April 10, 2000). In the instant case, no witnesses testified at the hearing, and the trial court made no first-hand evaluation of witnesses. Therefore, we are on an even keel with that court, reviewing a record limited to one exhibit and two affidavits.

## Disciplinary Rules, Imputed Disqualification, and the Appearance of Impropriety

The Tennessee Supreme Court has the exclusive power to regulate the conduct of lawyers in Tennessee, see In re Petition of Burson, 909 S.W.2d 768, 773 (Tenn. 1995); Smith County Educ.

Ass'n v. Anderson, 676 S.W.2d 328, 333 (Tenn. 1984), but has empowered the Board of Professional Responsibility to construe the Court's ethics rules, see Tenn. S. Ct. R. 9, § 26. Tennessee's three-tiered Code of Professional Responsibility, as adopted by the Tennessee Supreme Court, comprises: mandatory Disciplinary Rules, establishing minimum allowable standards of conduct; Ethical Considerations, those principles embodying objectives for attorneys to strive toward; and Canons, general statements of axiomatic norms. See Clinard, No. 01A01-9801-CV-00029. Decisions are not in accord regarding whether the Code constitutes a governing body of law. Compare Gracey v. Maddin, 769 S.W.2d 497, 504 (Tenn. Ct. App. 1989) and Clinard, No. 01A01-9801-CV-00029 at n.28 (Although the Canons and Ethical Considerations might not be part of a binding body of law, the same can not be said of the Disciplinary Rules.) with Tate, 925 S.W.2d at 550 and State v. Willie Claybrook, No. 3 (Tenn. Crim. App. filed Feb. 5, 1992, at Jackson). At the very least, however, the Disciplinary Rules may provide guidance for the courts. See Tate, 925 S.W.2d at 550.

In the instant case, we are primarily concerned with two Disciplinary Rules: "A lawyer shall not accept private employment in a matter in which the lawyer had substantial responsibility while the lawyer was a public employee, to avoid even the appearance of impropriety," Tenn. R. S. Ct. 8, DR 5-105(D), and, "If a lawyer is required to decline employment or to withdraw from employment under a disciplinary rule, no partner, or associate, or any other lawyer affiliated with that lawyer or that lawyer's firm may expect to continue such employment," Tenn. R. S. Ct. 8, DR 9-101. Therefore, by imputed disqualification, an attorney's professional colleagues may be barred from representation when that individual attorney may not represent the client. See Clinard, No. 01A01-9801-CV-00029 (citation omitted).

Applied indiscriminately, imputed disqualification under these Rules would significantly limit attorney mobility. In particular, screening arrangements often shield ex-government officials and attorneys moving into private practice from cases involving their former government employment. Thus, well-qualified attorneys may enter government service without fear of unemployability resulting from that service. See Amoco Chemicals Corp. v. MacArthur, 568 F. Supp. 42, 47 (N.D. Ga. 1983); Petroleum Wholesale, Inc. v. Marshall, 751 S.W.2d 295, 297 (Tex. Ct. App. 1988).[2]

---

[2] The Tennessee Supreme Court has not provided an "authoritative interpretation" of Tennessee Supreme Court Rule 8, DR 5-105(d). See Clinard, No. 01A01-9801-CV-00029. Tennessee's intermediate appellate courts and the Tennessee Board of Professional Responsibility have, however, endorsed the 7th Circuit's three-part analysis regarding imputed disqualification:

    (1) As a threshold inquiry, does a substantial relationship exist between the present and the former representation;

    (2) if so, has the presumption of shared confidences with respect to the former representation been rebutted; and

    (3) has the presumption of shared confidences with respect to the current representation been rebutted.

See Schiessle v. Stephens, 717 F.2d 417, 420-21 (7th Cir. 1983); Tate, 925 S.W.2d at 557-58; Lemm v. Adams, 955

(continued...)

## Appearance of an Impropriety

In some circumstances involving the appearance of impropriety forbidden by the Disciplinary Rules associated with Canon 9, screening procedures inadequately allay public suspicion of the representation. <u>See, e.g.</u>, <u>Marshall</u>, 751 S.W.2d at 295, 300. However, absent a claim that the trial will be tainted, "appearance of impropriety is simply too slender a reed on which to rest a disqualification except in the rarest of cases. This is particularly true where . . . the appearance of impropriety is not very clear." <u>Board of Educ. of NY City v. Nyquist</u>, 590 F.2d 1241, 1246-47 (2nd Cir. 1979); <u>see also</u> <u>Penn. Mut. Life Ins. Co. v. Cleveland Mall Ass'n</u>, 841 F. Supp. 815, 818 (E.D. Tenn. 1993); <u>Tracy Watson v. Faye Ameredes</u>, No. 03A01-9704-CV-00129 (Tenn. Ct. App. filed Dec. 10, 1997). Therefore, we must determine if the instant case is among those "rarest of cases."

## Legal background

No located Tennessee case directly addresses the instant issue. Decisions cited by the defendant generally involve reverse situations, addressing disqualification of prosecutors formerly associated with defense, <u>see</u> <u>Phillips</u>, 672 S.W.2d 427; <u>Mattress v. State</u>, 564 S.W.2d 678 (Tenn. Crim. App. 1977), or a prosecutor who was formerly a trial judge involved in the case, <u>see</u> <u>Tate</u>, 925 S.W.2d 548. An associate prosecutor's minimal former involvement with defense of the defendant did not disqualify the entire prosecutor's office. <u>See</u> <u>Mattress</u>, 564 S.W.2d 678. In <u>Mattress</u>, the attorney, formerly employed with a legal clinic, did not recall speaking with either of two defendants, and those defendants did not recall speaking with him or divulging any confidences to him. <u>See</u> <u>id.</u> at 679. As a prosecutor, the attorney interviewed state's witnesses and prepared a motion to continue. <u>See</u> <u>id.</u> Disqualification beyond the individual attorney "was unnecessary to preserve the appearance of a fair trial or to protect the appellant's rights." <u>Id.</u> at 680 (citation omitted).

---

[2](...continued)
S.W.2d 70, 74-75 (Tenn. Ct. App. 1997). The courts should review imputed disqualification assertions on a case-by-case basis, considering factors that include:

(1) The size of the firm;

(2) the extent of departmentalization within the firm;

(3) prohibitions of discussion of action with the new member; and

(4) exclusion of the new member from relevant files, participation in the action; and sharing fees from the action.

<u>See</u> <u>Manning v. Waring, Cox, James, Sklar and Allen</u>, 849 F.2d 222, 225-26 (6th Cir. 1988).

The recent <u>Clinard</u> opinion, authored by Judge William C. Koch, Jr., of the Tennessee Court of Appeals, analyzes pertinent ethics rules and considerations and synthesizes relevant precedent. Therefore, while noting that the Tennessee Supreme Court has granted permission to appeal, we find the articulated procedure instructive:

Once a party seeking disqualification establishes a prima facie case, the burden shifts to the lawyer and the firm whose disqualification is sought to demonstrate why they should not be disqualified. . . . Any doubts regarding the existence of an asserted conflict should be resolved in favor of disqualification.

<u>Clinard</u>, No. 01A01-9801-CV-00029 (citations omitted).

In contrast, disqualification of an entire prosecutor's office may be appropriate if an attorney works both sides of a case. In Phillips, an attorney who had interviewed a defendant on multiple occasions and filed various motions regarding the competency of that defendant was hired by the prosecutor's office, where his work on the case included seeking expert testimony to refute his prior work on the competency issue. See Phillips, 672 S.W.2d at 429-30, 436. Despite the trial court's characterization of this as "clerical" work, not mandating disqualification, a panel of this Court disqualified the entire office and remanded for a new trial. See id. at 429, 436.

In Tate, Criminal Court Judge Nichols signed several indictments against a defendant and presided over several proceedings for the following two years. See Tate, 925 S.W.2d at 549. After being appointed as District Attorney General, Nichols discussed the case several times with an assistant prosecutor, but the attorneys asserted that no new information was related. See id. Nichols further asserted that he did not recall receiving any ex parte information from the defendant that was unavailable to the state by other means. See id. The trial court denied the defendant's motion to disqualify the prosecutor's office, finding neither actual conflict of interest nor appearance of impropriety. See id. However, a panel of this Court noted the absence of screening measures, observed that "[t]he perception of a fair trial is just as important as the reality," and disqualified the entire prosecutor's office as "the only means of preserving the public confidence in the conduct of th[e] trial." Id. at 558.

Courts in other jurisdictions have reviewed analogous cases and required a fairly high level of involvement between the initial prosecution and the transitory attorney, see State v. Anaya, 732 P.2d 1241 (Col. Ct. App. 1986), and have declined to disqualify a firm under either vicarious disqualification twice-removed from original source, see State v. Martinez, 673 P.2d 509 (N.M. Ct. App. 1983), or, through a "common sense" approach, when the potential for shared confidences is based on a "presumption upon a presumption," see America's First Credit Union v. America's First Credit Union, 519 So.2d 1325 (Ala. 1988).

In First Credit Union, the defendant sued for malicious prosecution after a charge of theft was nol-prossed. See id. at 1326. An assistant prosecutor during the pendency of the criminal action became an associate with the defendant's counsel for both cases and assisted that counsel with the malicious prosecution suit. See id. On the petitioner's motion to disqualify the prior prosecutor and the firm he joined, the trial court found that the prior assistant prosecutor played an active part in neither the prosecution nor the decision to terminate that prosecution. Alabama's Code of Professional Responsibility therefore did not require disqualification of the attorney because of any appearance of impropriety. See id.

The trial court denied the motion to disqualify the firm because no basis for imputed disqualification existed. The Supreme Court of Alabama agreed with the parties' mutual concession that the jurisdiction's "common sense" approach did not mandate "grafting Canon 9 principles onto DR 5-105(D)" for a strict interpretation and application of the imputed disqualification doctrine. See id. That Court endorsed the defendant's argument that the former prosecutor neither participated in nor possessed actual knowledge of the original prosecution and that any imputed knowledge could not be further imputed to Copeland's coworkers. See id. Therefore, the Supreme Court refused to

extend disqualification to the remainder of the attorneys based on a "presumption upon a presumption." Id.

Similarly, where a law firm representing a defendant hired a former deputy prosecutor, who did not subsequently participate in the defense, the Colorado Court of Appeals held that disqualification of that attorney required personal involvement to an important, material degree in the investigation or in the deliberative process of the case. See Anaya, 732 P.2d at 1242-43. That attorney participated in one or two short discussions about the prosecution while an assistant attorney general, had neither read the file nor interviewed any witnesses, and did not even know what charges had been filed. See id. In light of this minimal involvement, the trial court's disqualification of the attorney based on a "mere appearance of impropriety" was an abuse of discretion.[3] See id. See generally Anaya v. People, 764 P.2d 779 (Colo. 1988) (The Supreme Court of Colorado reversed and remanded, assuming arguendo that the trial court did abuse its discretion but rejecting the intermediate appellate court's harmless error analysis.).

In Martinez, the "infected" attorney was twice-removed from any possible conflict. Vaughn, an assistant prosecutor, prosecuted the defendant on a particular conviction. See id. at 511. Vaughn then entered private practice with Hunt, who thereafter briefly represented the defendant on a habitual offender charge. See id. Mathis, a third attorney, then assumed representation on the habitual charge, and Hunt commenced sharing office space with Mathis. See id. Mathis, joined by the defendant, moved to withdraw. See id. The trial court found no need for disqualification under any conflict of interest or appearance of impropriety. See id. On appeal, the state was unconcerned with breach of confidence or divided loyalties, so the Court of Appeals of New Mexico declined to apply equitable principles, an appropriate course of action if a party protected by ethical rules asserts that they have or will be violated, and treated the matter as a request for new counsel. See id. at 513. That Court opined that office sharing might constitute an affiliation contemplated by DR 5-105(D) but found such conclusion unnecessary. See id. at 511. Since the counsel was twice-removed from any possible taint, disqualification was not needed. See id. at 514.

### The Instant Case

Decisions from other jurisdictions provide only limited guidance. The Tennessee Supreme Court has the ultimate authority over ethical issues in this state. Further, the instant case differs significantly from all the cited precedent: The involved attorney was the district attorney general and not an assistant prosecutor. Also, the cited Tennessee authority involves attorneys moving from private to public practice or from one branch of public service to another, whereas the instant case involves transition from public to private practice.

Private and public practice have significant distinctions, such that screening procedures for attorneys in government service are generally viewed with less skepticism: "The relationships

---

[3] Also, after a special prosecutor was appointed, the district attorney general's office had no connection with the case. See id.

among lawyers within a government agency are different from those among partners and associates of a law firm. The salaried government employee does not have the financial interest in the success of departmental representation that is inherent in private practice." United States v. Caggiano, 660 F.2d 184, 191 (6th Cir. 1981) quoted in Tate, 925 S.W.2d at 556-57. In the instant case, Dotson, Sr., expressly attested that the two have separate practices with only occasional collaboration. They have, however, held themselves out to the public as a joint practice of some type and therefore as agents of each other. See, e.g., ABA Formal Op. 88-356, Dec. 16, 1998 ("[T]wo practitioners who share office space and occasionally consult or assist each other would not be regarded as constituting a firm. However, if they present themselves to the public in a way suggesting that they are a firm . . . they should be regarded as a firm for purposes of the Rules.")(opinion specifically addressing conflict of interest provisions). The affiliation between the two is, at the very least, ostensibly significant, although we do not propose a per se rule that office sharing is the type of affiliation contemplated by DR 5-105(D). See, e.g., Kinard v. Kinard, 986 S.W.2d 220, 229 n.6 (Tenn. Ct. App. 1998) ("The trial judge would have been required to recuse himself if he had still an office sharing arrangement with Mr. Kinard's lawyer when Mr. Kinard filed for divorce.")(discussing Tennessee Supreme Court Rule 10, Canon 3(E)(1)(b) and disqualifying a lawyer with whom the judge previously practiced law in that same matter).

Further, although Dotson, Sr., does not currently remember anything significant about the case, as the District Attorney General at the time of indictment he was required to sign that indictment, thereby attesting to his "sanction and approbation" of that bill. See Fout v. State, 4 Tenn. (3 Hayw.) 98, 99(Tenn. 1816); see also James E. Martin v. Howard Carlton, No. 03C01-9807-CR-00253 (Tenn. Crim. App. filed June 7, 1999, at Knoxville) (opinion applying the Fout holding in discussion of Tennessee Code Annotated § 40-13-303, current statute requiring signature of district attorney general on indictments). The salutary principle behind the signature requirement is to benefit a defendant found innocent by identifying a party from whom to seek redress. See State v. Marks, 464 S.W.2d 326, 328 (Tenn. Crim. App. 1971).

A district attorney general is a public officer under the Code. See Tate, 925 S.W.2d at 552. The Tennessee Supreme Court has discussed a district attorney general's responsibilities:

> He is to judge between the people and the government; he is to be the safeguard of the one and the advocate for the rights of the other; he ought not to suffer the innocent to be oppressed or vexatiously harassed, any more than those who deserve prosecution to escape; he is to pursue guilt; he is to protect innocence; he is to judge of circumstances, and, according to their true complexion, to combine the public welfare and the saf[e]ty of the citizens, preserving both, and not impairing either; he is to decline the use of individual passions, and individual malevolence, when he can not use them for the advantage of the public; he is to lay hold of them where public justice, in sound discretion, requires it. . . . Does every one feel the responsibility imposed by the oath of the solicitor-general by his selection for the discharge of these duties, by the confidence of the public reposed in him, by a consciousness of the impartial duties he owes to society and his country? Is every one actuated for the solicitor-general with the proud ambition of equaling [sic] the public expectation, and

proving to his country that they have not been deceived in making choice of him? Is every one in his behalf under the full operation of those thousand feelings excited by confidence in his integrity, which a virtuous mind will experience, which nothing but experience can give a knowledge of, and which can not be adequately represented by words?

Fout, 4 Tenn. (3 Hayw.) at 98, 99-100 (Tenn. 1816), quoted in In re Death of Reed, 770 S.W.2d 557, 560 (Tenn. Crim. App. 1969) (citation omitted).

The duties make a "substantial responsibility" over prosecution under that office's authority a nearly per se conclusion. Although the "substantial responsibility" component of the imputed disqualification analysis "envisages a much closer and more direct relationship than that of a mere perfunctory approval or disapproval of the matter in question, . . . it is not necessary that the public employee or official shall have personally and in a substantial manner investigated or passed upon the particular matter." Rather, "heavy responsibility" for the matter in question implies substantial involvement in, at the very least, the deliberative process, such that the "strong and compelling" responsibility should bar subsequent representation in the same matter. Tate, 925 S.W.2d at 551-52 (citation omitted).

We must conclude that, at the very least, a district attorney general signing an indictment is responsible for knowledge of the charges and for the decision to formally pursue prosecution. Such involvement constitutes "substantial relationship." See Tate, 925 S.W.2d at 551 (A part in the deliberative process may satisfy the "substantial relationship" prong.).

We concur with the trial court's decision regarding the appearance of impropriety. Disqualification is a harsh remedy, and when invoked it defeats both the attorney's expectation to practice law and the criminal defendant's qualified right to counsel of their choice. See Clinard, No. 01A01-9801-CV-00029; State v. Parrott, 919 S.W.2d 60, 61 (Tenn. Crim. App. 1995). However, "[i]n an age of sagging public confidence in our legal system, maintaining confidence in that system and the legal profession is of utmost importance," Roberts & Schaefer Co. v. San-Con, Inc., 898 F. Supp. 356, 363 (S.D. W. Va. 1995), and "courts have a continuing obligation to . . . maintain the public's confidence in the integrity of the legal system," Clinard (citations omitted). Therefore, disqualification as a consequence of an appearance of impropriety is not per se barred, and we conclude that the facts of this particular case qualify it as one of "the rarest of cases" in which disqualification is an appropriate bar against that appearance. See Watson, No. 03A01-9704-CV-00129.

We must presume that Dotson, Sr., fulfilled all the weighty duties required under his former position. He is not assumed to have been on the periphery of the prosecution, as an uninvolved assistant prosecutor office might have been. See, e.g., Watson, No. 03A01-9704-CV-00129. Should Dotson, Sr., have sought an active role in representing the defendant, he would have, "[f]or all practical purposes, . . . switched sides." Penn. Mut., 841 F. Supp. at 818 (cited in Watson, No.03A01-9704-CV-00129). Such representation is forbidden, and Dotson, Sr., implicitly

acknowledges this fact in his affidavit, as he attests that he has not represented anyone on a case originated by his office while he was the chief prosecutor.

The crux of this analysis therefore becomes the nature of the Dotsons' professional affiliation: Is it one contemplated by DR 5-105(D)? Notwithstanding the uncontroverted affidavit from Dotson, Sr., attesting to the separate practices with only limited congruence, that congruence is significant from an outsider's perspective. One need only look at the advertisement, entered as an exhibit at the hearing: The attorneys share an office, share a common business telephone, and apparently, share common areas of practice. In that advertisement, Dotson, Sr., holds himself out as the prior District Attorney General. Limiting our holding to the facts and circumstances of this particular case, we conclude that an appearance of impropriety requiring disqualification exists.[4]

## CONCLUSION

We affirm the judgment from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

---

[4] As noted earlier, we have reviewed this matter de novo. Should we have applied an abuse of discretion standard, we would conclude that the trial court did not abuse its discretion.

