## PENN MUTUAL LIFE INSURANCE COMPANY, Plaintiff,

v.

CLEVELAND MALL ASSOCIATES; Clev–Tenn Associates; Cleveland Mall Corporation; Steven Frankel; Martin Barell; Donald Shack; CBL Management, Inc.; Lebcon Associates; and Sears, Roebuck & Co., Inc., Defendants.

No. 1:93–cv–77.

United States District Court, E.D. Tennessee, at Chattanooga.

Dec. 10, 1993.

Jeffery A. Billings, Bob Edward Lype, James R. McKoon, Heiskell, Donelson, Bearman, Adams, Williams & Caldwell, Chattanooga, TN, for Penn. Mut. Life Ins. Co.

Hugh J. Moore, Jr., Philip B. Whitaker, Jr., Witt, Gaither & Whitaker, Chattanooga, TN, Richard M. Resnik, Mandel & Resnik, New York City, for Cleveland Mall Associates, Clev–Tenn Associates, Cleveland Mall Corp., Steven Frankel and Donald Shack.

Everett Layne Hixson, Jr., Donna S. Spurlock, William G. Colvin, Shumacker & Thompson, Chattanooga, TN, for CBL Management, Inc. and Lebcon Associates.

Harry Weill, Weill & Weill, Chattanooga, TN, for Sears, Roebuck and Co., Inc.

## *MEMORANDUM*

EDGAR, District Judge.

This case is before the Court on the motion of defendants Cleveland Mall Associates, Clev–Tenn Associates, Cleveland Mall Corporation, Steven Frankel, and Donald Shack to

disqualify plaintiff's counsel and to stay further proceedings. (Court File No. 35). The motion was referred by the Court to United States Magistrate Judge John Y. Powers (Court File No. 49). Judge Powers rendered a report and recommendation (Court File No. 69) wherein he has recommended that the motion be granted. Plaintiff Penn Mutual Life Insurance Company ("Penn Mutual") has filed objections to the report and recommendation. (Court File No. 72). The issue here is whether a "Chinese Wall" erected by the law firm currently representing Penn Mutual in this case is sufficient to prevent that firm's disqualification.

## I.

The Court reviews the magistrate judge's findings of fact and conclusions of law *de novo*. 28 U.S.C. §§ 636(b)(1)(B) and (C); *Brown v. Wesley's Quaker Maid, Inc.*, 771 F.2d 952, 954 (6th Cir.1985), *cert. denied*, 479 U.S. 830, 107 S.Ct. 116, 93 L.Ed.2d 63 (1986). This lawsuit arises out of a loan which was made in September 1989 by plaintiff Penn Mutual to defendant Cleveland Mall Associates ("CMA"), a limited partnership. The purpose of the loan was to refinance and improve a shopping center owned by CMA in Cleveland, Tennessee. After the loan was made, several major tenants left the mall. The loan went into default in March 1991. Penn Mutual acquired title to the mall by foreclosure in June 1991. Penn Mutual was advised during and after the foreclosure proceedings by the Chattanooga law firm of Caldwell Heggie & Helton ("Caldwell Heggie"). Caldwell Heggie ·was a Chattanooga law firm consisting of approximately twenty attorneys. After being notified of the loan default, CMA and its general partner, Clev–Tenn Associates ("Clev–Tenn") retained Heiskell, Donelson, Bearman, Adams, Williams & Kirsch ("Heiskell Donelson") to represent them in the dispute with Penn Mutual. Heiskell Donelson was a firm based in Memphis with offices in various cities, including Chattanooga. Heiskell Donelson had in excess of one hundred attorneys. Two Caldwell Heggie attorneys (both in Chattanooga) and two Heiskell Donelson attorneys (one in Memphis and one in Chattanooga) were the protagonists in advising their respective clients in the dispute which gave rise to this case.

Penn Mutual, represented by Caldwell Heggie, filed suit on February 12, 1993. The lengthy allegations as against CMA and Clev–Tenn may be summarized as follows:

(1) Penn Mutual alleges that it would not have made the loan but for certain misrepresentations made by the defendants concerning the status of mall tenants; and

(2) Penn Mutual alleges that these defendants breached an agreement with Penn Mutual and converted Penn Mutual's money to their own use by failing to turn over to Penn Mutual certain rent and other income that was received from the operation of the mall after the loan was in default.

Among the specific causes of action asserted against CMA, Clev–Tenn and the three individual defendants who were associated with these entities is a claim for treble damages ·under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). 18 U.S.C. §§ 1961, 1962 and 1964. Penn Mutual also seeks punitive damages.

In the period after the foreclosure CMA and Clev–Tenn, along with defendant Steven R. Frankel, shared confidential information with the Heiskell Donelson attorneys; and asked for and received legal advice on various issues associated with the loan. Among the advice solicited and received by these defendants was what should be done with rents collected after the foreclosure from mall tenants. On February 19, 1993, after this suit was filed, Mr. Frankel sent a letter to Heiskell Donelson attorneys discussing various allegations in the complaint. Thereafter on February 24, 1993, Henry Doggrell of Heiskell Donelson sent a letter to Mr. Frankel advising him that because there was a pending merger between Heiskell Donelson and Caldwell Heggie, Heiskell Donelson would not be able to represent the defendants in this litigation. The defendants then obtained other counsel. Sometime thereafter Doggrell sent to the defendants all of Heiskell Donelson's files relating to the representation of the defendants. Heiskell Donelson

and Caldwell Heggie merged on July 1, 1993. The merged firm changed its name to Heiskell, Donelson, Bearman, Adams, Williams & Caldwell. The merged firm has continued to represent plaintiff Penn Mutual in this lawsuit.

## II.

■ Most of the legal jousting in this case has centered on the ethical requirement for preserving client confidences set forth in DR 4–101[1] which is a part of the CODE OF PROFESSIONAL RESPONSIBILITY (1992) adopted by the Supreme Court of Tennessee and by the local rules of this Court. E.D.TN. LR 83.6. The cases cited by the parties deal with instances where small numbers of government or private attorneys have moved to a law firm. Here, the courts have wrestled with the competing policy interests of preserving client confidences and of permitting a party to retain counsel of choice. *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 224 (6th Cir.1988). In these cases the presumption that an attorney shares client confidences with his or her law firm has been held to be rebuttable by the erection of a Chinese Wall or screening device to insulate the law firm from information possessed by "infected" attorneys about their former clients. The efficacy of a Chinese Wall is said to be subject to a case-by-case analysis directed at

> the size and structural divisions of the law firm involved, the likelihood of contact between the "infected" attorney and the specific attorneys responsible for the present representation, the existence of rules which prevent the "infected" attorney from access to relevant files or other information pertaining to the present litigation, or which prevent him from sharing in the fees derived from such litigation.

*Manning,* 849 F.2d at 226 (quoting *Schiessle v. Stephens,* 717 F.2d 417, 421 (7th Cir.1983)).

■ In June 1993, just before the formal merger, both Caldwell Heggie and Heiskell Donelson implemented written "conflict policies" designed to insulate the merged Heiskell firm from information possessed by "infected" attorneys. Those policies are now the policy, or Chinese Wall, of the merged firm. Affidavits filed by partners in the merged Heiskell firm attesting to the implementation of the policy have not been, nor would one expect them to be, contested. To the extent that an analysis of the efficacy of the policy can be made, it is noteworthy that one of the Heiskell Donelson attorneys who represented the defendants in the loan transaction is now in the Chattanooga office of the merged Heiskell firm with attorneys who represent plaintiff Penn Mutual. Also, there appears to be nothing in the conflict policy which would prevent "infected" lawyers from sharing in the fees derived from the Penn Mutual litigation. Finally, the policy was not implemented until five months after this lawsuit was filed. Nonetheless, these observations may well be meaningless, and the Court has no reason to doubt the assertion of the merged Heiskell firm that confidences have not been shared.

---

1. **Preservation of Confidences and Secrets of a Client.**—(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:
(1) Reveal a confidence or secret of his client.
(2) Use a confidence or secret of his client to the disadvantage of the client.
(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.
(C) A lawyer may reveal:

(1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.
(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.
(3) The intention of his client to commit a crime and the information necessary to prevent the crime.
(4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct.
(D) A lawyer shall exercise reasonable care to prevent his employees, associates, and others whose services are utilized by him from disclosing or using confidences or secrets of a client, except that a lawyer may reveal the information allowed by DR 4–101(C) through an employee.

## III.

The erection of a Chinese Wall, however impenetrable, does not alleviate ethical concerns in every case. This is not a case where one or two attorneys have joined a law firm on the other side of the Rubicon. This was a fairly large law firm merger where the original Heiskell firm of over a hundred attorneys with offices, *inter alia*, in Memphis and Chattanooga, merged with the Caldwell Heggie firm, which had approximately twenty attorneys located in Chattanooga. The defendants in this case were represented by Heiskell Donelson's attorneys located both in Memphis and in Chattanooga. Attorneys in the Heiskell Donelson firm were intimately involved in advising the defendants in connection with the dispute for which the defendants now find themselves being sued.

While it has been said that Cannon 9's admonition that lawyers should avoid even the appearance of impropriety is "too slender a reed on which to rest a disqualification order," *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 725 (7th Cir.1982), there is nevertheless a legitimate concern about the appearance of impropriety here which lends weight to the proposition that the merged Heiskell firm should be disqualified. The defendants were closely advised by lawyers of the firm of Heiskell, Donelson, Bearman, Adams, Williams & Kirsch. After the defendants were sued, a law firm dominated by that same firm, and bearing virtually the same name—Heiskell, Donelson, Bearman, Adams, Williams & Caldwell—showed up on the other side of the dispute. For all practical purposes, the lawyers have switched sides. Clients must feel free to share confidences with their lawyers. This will not occur if we permit lawyers to be today's confidants and tomorrow's adversaries. *See Analytica, Incorporated v. NPD Research*, 708 F.2d 1263, 1269 (7th Cir.1983).

## IV.

Heretofore we have been dealing with ethical requirements designed to preserve client confidences. Actually this case is more appropriately addressed by the rules on conflicts of interest, specifically DR 5–105.[2] Under this rule, a lawyer cannot represent clients with conflicting interests unless the requirements of DR 5–105(C) are met. When Penn Mutual, represented by Caldwell, Heggie, filed this lawsuit on February 12, 1993, the defendants CMA and Clev–Tenn were represented by Heiskell Donelson. At this time, merger discussions between Heiskell Donelson and Caldwell Heggie were underway. Defendant Steven R. Frankel sent a letter to Henry Doggrell of Heiskell Donelson on February 19, 1993, enclosing a copy of a complaint; commenting on portions of the complaint; and requesting that Heiskell Donelson represent certain of the defendants in the litigation. Doggrell, after discussing the conflict with a law partner, who then discussed it with Caldwell Heggie attorneys, advised Frankel by letter dated February 24, 1993, that Heiskell Donelson could not represent the defendants in this litigation.

 While the merger did not finally occur until July 1, 1993, there was obviously a conflict that the parties readily recognized while merger negotiations were ongoing. When a conflict between the interests of two

2. **Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.**—(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.

clients exist, a merged firm is not permitted to pick and choose which clients survive the merger. To permit this would be to "violate the duty of undivided loyalty that the firms owe to each of their clients under DR 5–105." *Picker International, Inc. v. Varian Associates, Inc.,* 869 F.2d 578, 583 (Fed.Cir.1989), *affirming Picker International, Inc. v. Varian Associates, Inc.,* 670 F.Supp. 1363 (N.D.Ohio 1987). Conflicts of interest will doubtless develop frequently if law firm mergers become even more common. This, however, is not justification for lowering the ethical standards of the legal profession. A Chinese Wall is not a cure for a conflict of interest.

### V.

There is a final troubling aspect in this ethics dispute that has not yet been specifically discussed by the parties. What about the interests of plaintiff Penn Mutual? Here we have the merged Heiskell firm representing Penn Mutual and alleging that the defendants have made certain misrepresentations (including RICO violations) and converted rents due Penn Mutual. During at least part of the time when this was allegedly done, the defendants were represented by lawyers of the merged Heiskell firm. Penn Mutual seeks, among other relief, treble and punitive damages. The defendants defend partially on the ground that they followed the advice of counsel. Of course, the facts are yet to be ascertained. However, it is conceivable that if the merged Heiskell firm vigorously and successfully pursues these claims, it could be opening itself up to a legal malpractice claim initiated by the defendants. Under these circumstances there is certainly the appearance of a conflict; an appearance that should be dissolved.

### VI.

The resolution of the disqualification issue, as stated above, necessitates balancing competing interests. One of the interests to be considered is the interest in permitting Penn Mutual to retain its own counsel. On this question, it is appropriate to consider whether or not disqualification would work a hardship to Penn Mutual. *Manning,* 849 F.2d at 225. There has been no showing that Penn Mutual would be peculiarly disadvantaged by being required to switch attorneys now. We are still early in this litigation. Discovery depositions are not scheduled to begin until January 17, 1994. On the other hand, the ethical considerations here are particularly weighty. The Court is mindful that disqualification motions are sometimes wrongly used as a litigation ploy. That does not appear to be the case here. In this case the wall erected by the merged Heiskell firm cannot be permitted to allow that firm to continue to represent Penn Mutual. The defendants' motion will be **GRANTED** so as to disqualify the merged Heiskell firm.

An appropriate order will enter.

### *ORDER*

In accordance with the memorandum opinion filed herewith, the defendants' motion (Court File No. 35) to disqualify plaintiff's counsel is **GRANTED.** Plaintiff's counsel is hereby **DISQUALIFIED.** Penn Mutual Life Insurance Company shall have a reasonable length of time to obtain new counsel. Should the parties require a change in the scheduling order entered by this Court on September 16, 1993 (Court File No. 62), they should notify the Court.

SO ORDERED.