IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT KNOXVILLE
_____

FILED

December 10, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

TRACY WATSON and DEAN WATSON,
Individually and as Next Friends
and Natural Guardians of TAYLOR
WATSON,

      Plaintiffs-Appellants,          Bradley Circuit No. V-96-590

Vs.                            C.A. No. 03-A-01-9704-CV-00129

FAYE AMEREDES, D.O., CHEROKEE
WOMEN'S CENTER, P.C., TED
AMEREDES, D.O., CLEVELAND
ANESTHESIOLOGISTS, INC., and
BRADLEY MEMORIAL HOSPITAL,

      Defendants-Appellees.
_____

FROM THE BRADLEY COUNTY CIRCUIT COURT
THE HONORABLE JOHN B. HAGLER, JR., JUDGE

Glenna W. Overton, Donald E. Overton;
Overton & Overton of Knoxville
For Appellants

Hugh J. Moore, Jr.; Philip B. Whitaker, Jr.
Witt, Gaither & Whitaker, P.C. of Chattanooga
For Appellee, Faye Ameredes

*AFFIRMED AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.**

CONCUR:

ALAN E. HIGHERS, JUDGE

WILLIAM H. WILLIAMS, SENIOR JUDGE

      This is a T.R.A.P. 9 interlocutory appeal from the order of the trial court disqualifying

some of plaintiffs' lawyers from further representation of plaintiffs in this case.

      The only issue for review is whether the trial court erred in disqualifying plaintiffs'

counsel. The parties relied on affidavits to establish the facts in the trial court, and there is very little dispute.

Lawyer, Roger Jenne, of Cleveland, Tennessee, was retained by plaintiffs to handle a medical malpractice case against the defendants, Faye Ameredes, D.O., Cherokee Women's Center, P.C., Ted Ameredes, D.O., Cleveland Anesthesiologists, Inc., and Bradley Memorial Hospital. In February, 1996, Jenne associated the law firm of Montgomery and Thompson of Knoxville, Tennessee to work with him on the case. Montgomery and Thompson is a partnership of two lawyers; Dr. J. Tucker Montgomery and Debra A. Thompson, specializing in handling plaintiff medical malpractice cases. Dr. Montgomery has an M.D. degree, and Ms. Thompson is a graduate physical therapist. A complaint filed July 2, 1996, alleges acts of malpractice against the various defendants prior to, during, and after the delivery of the infant plaintiff, Taylor Watson, which resulted in personal injuries to the infant. In July, 1996, the law firm of Robinson, Smith & Wells was retained by Faye Ameredes's insurance carrier to represent her and Cherokee Women's Center in the case. Defendants, Ted Ameredes and Cleveland Anesthesiologist, Inc., were represented by another law firm and Bradley Memorial Hospital by yet another law firm. Robinson, Smith & Wells assigned the case to lawyers, James D. Robinson and Timothy M. Pierce. Mr. Pierce began work on the case on July 19, 1996. Earlier in July, 1996, Mr. Pierce began actively seeking employment outside the Chattanooga, Tennessee area, and on July 12, 1996, sent a resume to Montgomery and Thompson in Knoxville. Mr. Pierce met with Dr. Montgomery and Ms. Thompson on July 21, 1996, to discuss employment possibilities, but on July 22, 1996, Mr. Pierce was informed by them that they did not wish to expand their practice. On July 23, 1996, Mr. Pierce contacted the Board of Professional Responsibility to inquire as to whether he should withdraw from the Watson case since he had been in contact with Montgomery and Thompson concerning employment, and he was advised that until there was a formal offer of employment he could continue to work on the Watson case. On November 5, 1996, Dr. Montgomery, Ms. Thompson, and Mr. Pierce agreed to form a new partnership named Montgomery, Thompson & Pierce to begin practice on January 1, 1997. On November 6, 1996, Mr. Pierce notified his law firm, Robinson, Smith & Wells, of his resignation with the request that he be insulated from any case involving Montgomery and Thompson, including the Watson case. During the period of time from July 19, 1996 to

November 6, 1996, Dr. Ameredes met personally with Mr. Pierce on two occasions and had telephone conversations with him on at least five occasions. During these meetings and telephone conversations, she communicated information concerning the litigation. Mr. Pierce used the information acquired from his client, Dr. Ameredes, to prepare the answer in defense of the litigation. In addition to drafting the answer, Mr. Pierce had communications with other physicians, other counsel for defendants and started preparing discovery matters.

Mr. Pierce's discussions and negotiations with Montgomery and Thompson continued during the period he was representing Dr. Ameredes, but Montgomery and Thompson and Pierce maintain there was no discussion concerning the case and that it was clearly understood there would be no discussion at any time concerning the case. They state further that when they decided to form the new firm, they agreed that there would be a separate checking account for the purposes of expenses associated with this case; that Montgomery and Thompson, a partnership, would remain an active partnership for the purpose of handling this case; that Pierce would have nothing at all to do with it; and that a "Chinese Wall" would be maintained to isolate Mr. Pierce from any connection whatsoever with the Watson file. Opinions of Attorney William Hunt, III, disciplinary counsel for the Board of Professional Responsibility and Professor Carl Pierce from the University of Tennessee College of Law were filed to the effect that there were no ethical violations by either Montgomery and Thompson or Mr. Pierce. Professor Pierce also opined that he had reviewed the screening mechanism instituted by Montgomery and Thompson and Mr. Pierce and that they were in compliance with Formal Ethics Opinion, 89-F-118. (March 10, 1989).

Defendant Ameredes's motion to disqualify Montgomery and Thompson was argued on February 3, 1997. The trial court granted the motion and disqualified Montgomery and Thompson with respect to defendant Faye Ameredes only. Defendant Ameredes filed a supplemental motion to disqualify Montgomery and Thompson from the case entirely, and that motion, along with a plaintiffs' motion for reconsideration, was heard on March 3, 1997. Subsequently, the court entered its order disqualifying Montgomery and Thompson from further representation of plaintiff in the case and certified an interlocutory appeal which was then granted by this Court.

Plaintiffs first assert that the motion to disqualify was not timely filed and was made for

3

the purposes of delay. However, it appears that the motion was filed January 17, 1997, and plaintiffs' counsel was notified in the middle of December, 1996, that the motion would be filed to disqualify them from further participation in the case. We do not see any inordinate delay in the record in this case.

Plaintiffs next assert that the action by the court was the most drastic option the court had, and that the court properly should have allowed the continued representation by Montgomery and Thompson with the stringent conditions of isolation that had been instituted. Plaintiffs argue that they should be able to rely upon the advice they received from disciplinary board attorneys. Moreover, they assert that their compliance with Formal Ethics Opinion 89-F-118 eliminates any reason for disqualification.

Rule 8 of the Supreme Court of Tennessee establishes a Code of Professional Responsibility consisting of three separate but interelated parts: Canon's, Ethical Considerations, and Disciplinary Rules. The Code's Preliminary Statement provides that the Canon's, Ethical Considerations, and Disciplinary Rules "do define the type of ethical conduct that the public has a right to expect not only of lawyers but also of their non-professional employees and associates in all matters pertaining to professional employment." Furthermore, "[a]n enforcing agency, in applying the Disciplinary Rules, may find interpretative guidance in the basic principles embodied in the Canons and in the objectives reflected in the Ethical Considerations."

Rule 9 of the Supreme Court of Tennessee pertains to discipline of lawyers and also provides for the establishment of three regional Ethics Committees authorized to issue "Formal Ethics Opinions." Ethics Opinions "issued and published by the Supreme Court Ethics Committee shall bind the committee, the person requesting and the Supreme Court Board of Professional Responsibility, and shall constitute a body of principles and objectives upon which members of the bar can rely for guidance in many specific situations." Rule 9, Section 26.5 (a), Rules of the Supreme Court.

The controversy before us emanates from Canons 4 and 9. Canon 4 provides: "A lawyer should preserve the confidences and secrets of a client." Canon 9 provides: "A lawyer should avoid even the appearance of professional impropriety." A lawyer cannot represent someone against a former client when there is a substantial relationship between the subject

4

matter of the new action and the action in which the lawyer represented the former client. *Manning v. Fort Deposit Bank*, 619 F. Supp. 1327 (D. Tenn. 1985); *Mills v. Crane*, C.A. No. 66, 1987 WL 9165 (Tenn. App., E.S., April 10, 1987). Formal Ethics Opinion 81-F-5 (April 17, 1981) concerns the disqualification of a law firm when one of the firm's lawyers is disqualified, and the committee opined that "when an attorney is barred from representation on the grounds of knowledge actually or presumably acquired from a formal representation, then his entire firm is similarly barred." This rule was made applicable to paralegals in Formal Ethics Opinion 87-F-110. In Formal Ethics Opinion 89-F-118 issued March 10, 1989, the committee was answering an inquiry "concerning clarification of Formal Ethics Opinions 81-F-5 and 87-F-110 and the application of screening procedures as a viable method to avoid the imputed disqualification provision of DR 5-105(D) of the Code of Professional Responsibility." The Opinion states:

> The board adopts the Seventh Circuit's three-step analysis, outlined in *Schiessle v. Stephens*, 717 F.2d at 420-421, concerning motions to disqualify counsel. That analysis requires a determination of
>
> 1. whether a substantial relationship exists between the subject matter of the former and present representations;
>
> 2. whether the presumption of shared confidences which arises from its determination that the representations are substantially related has been rebutted with respect to the *former* representation;
>
> 3. whether the presumption of shared confidences has been rebutted with respect to the *present* representation.
>
> \*       \*       \*
>
> The comment to Rule 1.9 of the ABA Model Rules of Professional Conduct suggests that the "underlying question [in determining whether a substantial relationship exists] is whether the lawyer was so involved in the matter that the subject representation can be justly regarded as a changing of sides in the matter in question."
>
> Screening mechanisms should be aimed at confining disqualification to the person who was involved in the substantially related matter and therefore infected with or tainted by privileged information which is the source of the ethical problem. Isolation of the infected person would allow the other lawyers and support personnel in the firm or office to assist in or conduct the questioned representation free from any taint of misuse of client confidences.
>
> The board approves the use of screening procedures as a viable

5

method to avoid the imputed or vicarious disqualification provisions of DR 5-105 (D). The board has further determined that the disqualificaiton rules and screening procedures are applicable to lawyer, law clerk, paralegal and legal secretary. All questions as to the sufficiency of the screening process are factual issues to be resolved by "objective and verifiable evidence presented to the trial court" and determined "on a case-by-case basis."

Those factors which the board approves as appropriate for consideration in determining whether "specific institutional screening mechanisms" have been implemented "to effectively insulate against any flow of confidential information from the quarantined [person]" to other members of his or her new firm include the following:

1. the structural organization of the law firm or office involved;

2. the likelihood of contact between the "infected" person and the specific attorneys and support personnel involved in the present representation;

3. the existence of law firm or office rules which prevent the "infected" person

a. from access to relevant files or other information pertaining to the present litigation and

b. from sharing in the fees derived from such litigation.

\* \* \*

Although the ethics opinions are not binding on the Court, *State v. Jones*, 726 S.W.2d 515, 519 (Tenn. 1987), they are important as representing the acknowledged standards of the profession. However, it is clear and the ethics committee recognizes that the determination of disqualification is to be made by the trial court on a case by case basis.

We are mindful of the competing public policy interests of preserving client confidences on the one hand and on the other hand of permitting parties to have counsel of their choice.

Plaintiffs correctly argue that the presumption of shared confidences can be rebutted by instituting adequate screening procedures commonly termed "a Chinese Wall." In the instant case, the trial court found that the lawyers involved implemented a "Chinese Wall" but felt that because of the small size of the firm, it could not be effective to the extent required. We must bear in mind that the problem before us in this case was caused entirely by the attorneys that now seek to continue representing plaintiffs. Mr. Pierce, the lead attorney for one defendant, prepared the original answer to the complaint, and we must conclude that he conformed to the

6

requirements of Rule 11 of the Tennessee Rules of Civil Procedure and obtained all necessary information concerning his client's case. Thus, we have a lawyer that knows more about the defendant's case than anybody else, is privy to every bit of confidential information available from his client and then joins forces with the lawyers suing his client for twelve million dollars. These attorneys had to know when they made their arrangements that the presumption of shared confidence would exist and that this sharp scrutiny would come to pass. This is somewhat different from the situation where a lawyer is on the periphery of a case as an associate member of a firm. Mr. Pierce was the defendant's lawyer and is now a partner with the lawyer for the plaintiff.

Judge Koch's concurring opinion in the unpublished case of *King v. King* states:

> However, except in the rarest of cases, the appearance of impropriety alone is "simply too slender a reed on which to rest a disqualification order." To warrant disqualificaiton, a lawyer's conflict of interest must tend to taint the trial's fairnes either by undermining the court's confidence in the attorney's ability to vigorously represent the client or by creating a reasonable concern that the attorney will give the present client an unfair advantage by using otherwise privileged information obtained while employed by the former client. *Board of Education v. Nyquist*, 590 F.2d at 1246-47.

*King v. King*, No. 89-46-11, 1989 WL 122981, at *13 (Tenn. App. M.S. Oct. 18, 1989).

We do not disagree with Judge Koch but perhaps this is "the rarest of cases." We can't emphasize too strongly that we are dealing with the lawyer for the defendant, the one in the trenches, the one that acquired all of the confidences of the client in order to further the client's interest. In our opinion, the appearance of impropriety in this case is not "too slender a reed."

In *Cardona v. General Motors Corp.*, 942 F.Supp. 968 (D.N.J. 1996), the Court was dealing with a motion to disqualify a law firm representing plaintiffs against General Motors after the law firm hired General Motors' former counsel in various lemon-law cases. The Court disqualified plaintiff's law firm even in the face of screening mechanisms that had been instituted. The Court said:

> Counsel for Appellants has advanced the proposition that the "appearance of impropriety doctrine" embodies "an arbitrary and vague standard." Appellants' Letter Brief, dated July 23, 1996, at 1. This challenge to the doctrine has frequently been made. *See, e.g.,* Cynthia M. Jacob, *A Polemic Against R.P.C. 1.7(c)(2): The "Appearance of Impropriety" Rule,* N.J. Lawyer Magazine, June 1996, at 23. This argument, however, underestimates the capacities of the "ordinary knowledgeable citizen" who elects our

federal, state and local governments, sits on our juries, and educates our children. What would such a citizen think upon discoverying that a lawyer, Mr. London, who had represented GM at two separate law firms, over a period of five years, and had become familiar with its litigation and settlement strategies, and had formed a close professional relationship with GM's legal personnel, suddenly "switched sides" to join a law firm which regularly sued GM and had, in fact, been on the other side of cases in which London had represented GM.

The answer, I respectfully suggest, would be the same answer given by Magistrate Judge Kugler. At the heart of every "side-switching attorney" case is the suspicion that by changing sides, the attorney has breached a duty of fidelity and loyalty to a former client, a client who had freely shared with the attorney secrets and confidences with the expectation that they would be disclosed to no one else. It is for this reason that the "appearance of impropriety doctrine" was adopted to protect the public, our profession, and those it serves. In short, this much maligned doctrine exists to engender, protect and preserve the trust and confidence of clients.

*Id.* at 974-75.

Canon 9 was accorded great weight in *Penn Mutual Life Insurance Co. v. Cleveland Mall Associates*, 841 F. Supp. 815 (E.D. Tenn. 1993), where the Court had for consideration a motion to disqualify plaintiff's counsel after the merger of the law firm representing plaintiff with the law firm representing the defendant. In reaching the decision that plaintiff's counsel should be disqualified, the Court said:

While it has been said that Canon 9's admonition that lawyers should avoid even the apperance of impropriety is "too slender a reed on which to rest a disqualification order," *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 725 (7th Cir. 1982), there is nevertheless a legitimate concern about the appearance of impropriety here which lends weight to the proposition that the merged Heiskell firm should be disqualified. The defendants were closely advised by lawyers of the firm of Heiskell, Donelson, Bearman, Adams, Williams & Kirsch. After the defendants were sued, a law firm dominated by that same firm, and bearing virtually the same name -- Heiskell, Donelson, Bearman, Adams, Williams & Caldwell -- showed up on the other side of the dispute. *For all practical purposes, the lawyers have switched sides. Clients must feel free to share confidences with their lawyers. This will not occur if we permit lawyers to be today's confidants and tomorrow's adversaries. See Analytica, Incorporated v. NPD Research,* 708 F.2d 1263, 1269 (7th Cir. 1983).

*Penn. Mut. Life Ins. Co.*, 841 F. Supp. at 818. (emphasis added).

We recognize, as argued by plaintiffs, that there are diverse opinions on the weight to be given to Canon 9 in disqualification cases. Disqualification is a drastic measure, and it is not to

be taken lightly. However, we are not unmindful of what has become in some instances rather poor public perception of lawyers. This could be attributed in part, at least, to the profession's relaxation of many of its rules of conduct that historically separated the profession from others.

In the case before us, the lawyers carefully planned their joinder -- a calculated and deliberate act with full knowledge that Pierce possessed the most intimate confidence of his client concerning the case. They argue that the screening procedures rebut the presumption of Pierce sharing these confidences. The new firm is small, and we hope the firm has the collegiality that typifies the brotherhood of the profession. In such an atmosphere, it is certainly conceivable that at best inadvertent references to the case could crop up from time to time. Who knows what effects such references might have on plaintiffs' lawyers in perhaps following some lead that was innocently, perhaps, fostered by some comment made without any improper motive. Leaving aside the possibility of divulged confidences, we are still faced with the appearance of impropriety. As in the *Penn Mutual* case, the lawyers in the case before us "switched sides."

We, like the Court in *Cardona*, believe that Canon 9 is essential to engender, protect, and preserve the trust and confidence of the client. In the case before us with these peculiar facts, we cannot say that the trial court erred in disqualifying plaintiffs' lawyers from further participation in the case. The profession demands, and the public deserves, no less.

Accordingly, the order of the trial court is afffirmed, and the case is remanded for such further proceedings as are necessary. Costs of the appeal are assessed against the appellants.

                                                     _____

**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**WILLIAM H. WILLIAMS,**
**SENIOR JUDGE**