# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 21, 2012 Session

## STATE OF TENNESSEE v. TINA M. DIXON

### Direct Appeal from the Circuit Court for Humphreys County
### No. 11671    George C. Sexton, Judge

_____

### No. M2010-02382-CCA-R3-CD - Filed June 21, 2012

_____

A Humphreys County jury convicted the Defendant, Tina M. Dixon, of possession of more than one-half ounce of marijuana with intent to sell or deliver within 1000 feet of a school zone and of possession of over 0.5 grams of cocaine with intent to sell or deliver within 1000 feet of a school zone. The trial court sentenced the Defendant to an effective sentence of twenty years in the Department of Correction. On appeal, the Defendant contends that: (1) the trial court erred when it denied her motion to suppress because the attachment order upon which she was arrested was unlawfully issued; (2) the trial court erred when it denied her motion to set aside her verdict because she was not properly charged with the crimes for which she was convicted; (3) she was denied due process of law because the presiding trial judge had previously prosecuted her for burglary and felony theft charges; (4) she was denied due process of law because the Assistant District Attorney General who prosecuted her case had previously been her public defender when she was convicted of burglary and felony theft charges; and (5) the trial court erred when it enhanced her sentence. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Kenneth ("Dale") Quillen, Nashville, Tennessee, for the appellant, Tina M. Dixon.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Lisa Donegan, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

This case arises from the Defendant's July 27, 2007, arrest for possession with the intent to sell controlled substances within 1000 feet of a school zone.

### A.  Motion to Suppress

On February 8, 2008, the Defendant filed a motion to suppress any testimony pertaining to the controlled substances allegedly seized from her.  She argued that police officers came to her house based upon a writ of attachment filed by the juvenile judge and that the writ was void.  Further, she stated that she did not freely and voluntarily consent to the officers searching the home.  Accordingly, she concludes, the arrest, seizure, and search all violated her constitutional protections.

The trial court held a hearing on the Defendant's motion, during which the following evidence was presented: Anthony L. Sanders testified that he served as the Probate and Juvenile Court Judge for Humphreys County.  As such, he had jurisdiction over child support.  Judge Sanders identified a "Contempt Proceedings Attachment" bearing his signature.  That attachment, made an exhibit, stated:

> It appearing to the Juvenile Court for Humphreys County, Tennessee, that Tina Hargrove Dixon, c/o James Hargrove, 26 Union Street, McEwen, Tennessee, is in Contempt of this court in that she has not appeared pursuant to an Order of this Court, dated May 1, 2007, requiring that she []show proof of income and disability.
>
> You are commanded to arrest her and have her before this Court on the 7th day of August, 2007, at 9:00 a.m. to show cause why she should not be held in contempt of this Court on these charges.  The respondent may be released from custody upon making an appearance bond in the sum of Twenty Five Hundred Dollars ($2,500.00) with good and sufficient sureties thereon.

Judge Sanders stated that it appeared from the document that Officer Brady Burns of the Humphreys County Sheriff's Department received the attachment on July 6, 2007.  The document also reflected that Officer Hagler served the document on July 27, 2007.

Judge Sanders said he had been serving as a judge for twenty-seven years and had never had a sheriff's deputy approach him and say that they could not serve an attachment because it was unlawful.  Judge Sanders said he did not issue orders of attachment lightly because a finding of contempt could be accompanied with jail time or a fine.

Judge Sanders testified that he had little recollection of the specifics of this case but, from the attachment, it appeared that he had ordered the Defendant to appear before him and that she had not appeared. He therefore issued the attachment so that she could appear before him to explain why she should not be punished for her failure to appear.

The Defendant moved to inspect the juvenile records, which the State contended were private and not subject to subpoena. The Defendant contended that the trial court could not made a determination about the validity of the attachment order without examining the file. The trial court ordered the file be viewed, and, after reviewing the file, Judge Sanders testified that it did not contain a copy of any document giving the Defendant notice that she was required to appear before him. Judge Sanders noted that there was an entry on his trial docket from June 3 that the Defendant did not appear, so an attachment bond of $2,500 was issued and the case was set for August 7, 2008. He confirmed that the notation was not an order but an entry on his docket. He said there was nothing in the record showing that the Defendant had personal knowledge that she was to appear, other than the notification to her attorney. The judge said that, more than likely, the Defendant was present at the hearing, wherein her court date was set but that he was not "100 percent" certain.

On redirect, Judge Sanders testified that, had the Defendant not been present at the hearing, the case would not have been reset, but, rather, he would have issued a petition to be served on the Defendant. Further, the record reflected that the Defendant was appointed an attorney at the May 1 hearing, which led the judge to believe that she was present at the hearing. Judge Sanders testified that he would not have issued the attachment for the Defendant unless she had notice of the July 3 hearing; rather, he would have reset the case. He said, therefore, he was certain that, at the time he issued the order, he thought that she had notice of the July 3 hearing. During further cross-examination, Judge Sanders testified that he did not issue a summons for the Defendant before he issued the attachment.

Wesley Hagler, a Humphreys County Sheriff's Department deputy, testified that he received an attachment for the Defendant on July 27, 2007. His responsibility after receiving the attachment was to locate the Defendant and bring her to jail, in order for her to appear in court. Deputy Hagler testified that he did not question the judge's order but attempted to carry out the order. While attempting to arrest the Defendant, the deputy and a fellow officer, Officer Tony Ahne, went to the Defendant's brother's home. The two officers knocked on the door, and an older gentleman, later identified as the Defendant's relative, who was sitting in a chair inside, told them to come into the home.

The two officers entered the home and asked the man about the Defendant. The man told them that the Defendant was in the other room sitting at the kitchen table. The two officers walked into the other room and asked for "Tina Hargrove." The Defendant

identified herself as "Tina Hargrove," and the officers informed her that they had an attachment for her arrest, explaining that it was from juvenile court.

Deputy Hagler testified that he smelled the odor of marijuana, and the two officers called other officers to assist them, including Sheriff Chris Davis. After some discussion that Deputy Hagler could not overhear between the Defendant and Sheriff Davis, the Defendant told the officers that the drugs were inside a video camera box located in a back room. While Deputy Hagler could not hear the discussion, he assumed that the Defendant gave Sheriff Davis consent to search the residence. He said he was under the impression the Defendant had given both written and verbal consent.

On cross-examination, Deputy Hagler testified that he had heard discussions that implied that his oath of office had not been filed with the Clerk of the Court of Humphreys county.

The parties stipulated that none of the Sheriff's deputies had filed the oath of office in the clerk's office at the time of the July 27, 2007, search.

During further cross-examination, Deputy Hagler testified that he detained the Defendant in the kitchen while Officer Ahne looked around the house. Officer Ahne saw two men in the back bedroom. Deputy Hagler's report indicated that the deputy asked the Defendant for consent to search, and she denied his request. Deputy Hagler said that, after the Sheriff spoke with the Defendant, Deputy Hagler saw a document consenting to a search of the residence that bore the Defendant's signature.

During redirect examination, Deputy Hagler testified that Officer Ahne looked throughout the house for safety reasons to ensure that the officers knew the location of the people inside the home. Deputy Hagler testified that the Defendant asked to speak with the Sheriff, which is why the Sheriff was called to the scene.

During further cross-examination, Deputy Hagler testified that the Defendant did not own the house but that her brother, Jackie Hargrove, was the owner. Jackie Hargrove was sleeping when the deputy first arrived. While Deputy Hagler had the Defendant detained, Jackie Hargrove exited his bedroom and told the deputy that the deputy could search any part of the house they wanted.

Sheriff Chris Davis testified that he was called to Jackie Hargrove's residence on July 27, 2007, by Deputy Hagler. Sheriff Davis was told that the Defendant wanted to speak to him or Chief Ronnie Moran. When the Sheriff arrived at the scene, the Defendant informed him that she suffered some medical issues and that she could not stay in the jail. She asked

the Sheriff if there was any way that, after she was arrested, she could immediately make bond. The Sheriff told her that he could attempt to contact Judge Sanders, the judge who signed the attachment, but that he had no control over her bond. The Defendant then told the Sheriff that, if he helped her with her bond, he could search the premises. The Sheriff said he had not made the Defendant any promises before she consented to the search, but he called the judge and explained the Defendant's medical issues. The judge indicated that he would work with the Defendant's ability to make bond. The Defendant then signed a consent to search form. After signing the consent, the Sheriff asked the Defendant where the drugs were located, and she showed him a camera box in a back bedroom.

On cross-examination, Sheriff Davis testified that the officers were at the scene before he arrived and, when he arrived, the officers were outside with the Defendant. The Sheriff did not know whether the Defendant was also given her Miranda warnings before she gave consent.

The Defendant testified that she was arrested for failing to appear in Juvenile Court. She said she had no knowledge that she was supposed to have been in court on July 3 or that an attorney had been appointed to represent her. On cross-examination, the Defendant agreed that in May 1991, she was convicted of burglary, two counts of felony theft, and "second offense" burglary.

The trial court ruled:

While a few things aren't clear, a few things are clear. It is clear from the Juvenile Court record that the Court examined and Mr. Quillen has examined that she was served with a petition for contempt on a child support matter. It appears from the summons it was served on April the 1st of '06, although some places indicate it was April the 5th.

Anyway, she was directed to appear in Court on April the 26th. On April 26th the case was reset until June the 28th of '06. Mr. Michael Williamson was appointed to represent her. On June 28th of '06 the case was reset until November the 29th of '06. Ms. Kelly was appointed to represent her. On November the 29th of '06, the case was reset to April 25th of '07, it was reset to July 3rd of '07. At which time, apparently, from the record and the issuance of the attachment, Ms. Hargrove did not appear. A person who has been served with a summons and has been summoned to court if the case is reset it is their duty to keep up with the date that the case has been reset to.

She claims that she didn't have actual knowledge, but she should have at least had constructive knowledge. She had an attorney of record. She had a case in court for which she had been served with a subpoena. So the Court finds the issuance of the attachment to have been proper. It was at least facially valid and the officer, even though [the Defendant's attorney] apparently pointed out it's been stipulated to that the officer hadn't filed his oath with the county Court Clerk, this Court is of the opinion that at least he was a defacto officer and none of the evidence will be suppressed for that reason.

The issue of whether or not th[e] [Defendant's] initial "no" cut the officers off from requesting a search later on, the Court is going to take the case under advisement. I'm a little rusty on that area of the law. I want to research that a little bit, whether or not they were allowed to ask Ms. Dixon later on for permission to search.

The trial court later issued a memorandum opinion in which it found:

1. The officers were present at the defendant's house pursuant to a Writ of Attachment issued by the Juvenile [Court] of Humphreys County.
2. Law Enforcement officers have a statutory duty to serve warrants and other process issued by courts of this state.
3. Having a statutory duty to serve process issued by courts of this state the officers were lawfully on the premises of the defendant.
4. Being lawfully on the premises the officers obtained a valid voluntary consent to search.
5. Since the officers were lawfully on the premises and obtained a valid voluntary consent to search, the Motion to Suppress should be overruled.

## B. Trial

The trial court bifurcated the Defendant's trial, holding the Defendant's trial on the charge that she committed the offenses in a school zone after the trial on the charges she possessed cocaine and marijuana. During the first portion of the proceedings, the following evidence was presented: Deputy Hagler testified similarly to his testimony during the motion to suppress hearing. He added that he and Detective Tony Ahne both worked in vice and their focus was on felony drug interdiction. He stated that the juvenile court issued an attachment order for the Defendant and that he went to the residence to serve the attachment order. He recounted that he knocked on the front door of the residence during daylight hours and was told to enter by a man sitting in the front room. Upon entering, the deputy noticed

a strong odor of marijuana. The deputy said he asked the man in the front room about the Defendant's whereabouts, and the man said she was in the next room. A small child, also in the room, led him into an adjacent room where the Defendant was sitting at a kitchen table.

Deputy Hagler testified that the Defendant identified herself, and he explained to her that he had an attachment order to take her to the county jail. The Defendant stood from the table, and the deputy was about to take her into custody when Detective Ahne entered the residence. He asked Deputy Hagler how many people were in the residence, and the deputy responded that he did not know. The detective looked around the house to determine how many people were present. Deputy Hagler took the Defendant to the front porch area of her house and told her that she was under arrest. He asked her about the smell of marijuana, and the Defendant said that there was no marijuana present in the home and that none had been smoked at the home.

Deputy Hagler testified that Detective Ahne returned from looking around the house and asked the Defendant if he could search the house. The Defendant said, "No." The two officers stood with the Defendant on the front porch waiting for a patrol unit to arrive and transport the Defendant to jail. Deputy Hagler testified that, while they waited, the Defendant brought up the issue of the search and said that she wanted to speak with the Sheriff, Chris Davis, about the matter. The officers called the Sheriff and asked that he come to the scene.

Deputy Hagler testified that, after the Sheriff arrived and spoke with the Defendant, the Sheriff instructed him that the Defendant had given officers consent to search her property. The Sheriff showed him a consent to search form that the Defendant had signed and dated.

On cross-examination, Deputy Hagler testified that after signing the search form, the Defendant accompanied them into the house, took them to a back bedroom, and indicated that the drugs were in her nightstand. In a cardboard box in the night stand, the officers saw what appeared to be to a baggie of powder cocaine, a baggie of crack cocaine, a baggie of marijuana, two empty plastic baggies, and some digital scales. Deputy Hagler testified that they did not place the Defendant under arrest that day for the drugs.

Sheriff Chris Davis testified that he received a call with regard to this case, asking him to go to the Defendant's residence and assist other officers. When he arrived, Detective Ahne told the Sheriff that the officers had asked for consent to search the premises and that the Defendant had requested that the Sheriff be present. The Sheriff informed the Defendant that the officers wanted her consent to search the house. The Defendant expressed concern

about her medical problems and making bond. The Sheriff read to the Defendant the consent to search form, and she signed the form.

After the Defendant signed the form, the Sheriff asked her if she had any drugs in the house. He told her that "now[]" was the time to cooperate. The Defendant led him into the house, to her bedroom, and toward a night stand. The Sheriff told her to just point out where the drugs were located and that the officers would retrieve them.

On cross-examination, the Sheriff testified that the Defendant turned herself into police custody the following day.

Jennifer Sullivan, a Special Agent with the Tennessee Bureau of Investigation ("TBI"), testified that she tested the evidence submitted in this case. She determined that investigators had found 5.7 grams of powder cocaine, 7.3 grams of cocaine base, and 38.3 grams of marijuana.

Detective Tony Ahne, with the Waverly Police Department, testified and confirmed much of the testimony of Deputy Hagler and Sheriff Davis. He said that, initially, he waited out in the car while Deputy Hagler approached the Defendant's house. He explained that he had worked in that area for years, and he was concerned that the occupants of the house would leave surreptitiously upon seeing him. He did not enter the residence until after Deputy Hagler radioed him and asked for assistance. After he entered, he became concerned about any other individuals present at the residence who might attempt to interfere with the Defendant's arrest. He, therefore, went through the house to determine who was present.

Detective Ahne confirmed that the Defendant initially denied consent to search the house and that she asked for Sheriff Davis to come to the house. After the Sheriff arrived, the Defendant consented to the search and signed a consent to search form. The detective also confirmed that, after the Defendant signed the form, she led the officers to her bedroom and pointed out the location of the drugs. Detective Ahne added that officers found $800 in cash in or near the Defendant's purse. The detective said that they did not seize that money. He explained that, because the money was not found near the drugs, he did not think he could establish that it was drug proceeds or that it was intended to be spent on drugs.

Based upon this evidence, the jury convicted the Defendant of possession of more than one-half ounce of marijuana with intent to sell or deliver and of possession of over 0.5 grams of cocaine with intent to sell or deliver.

The trial court then held the second portion of the bifurcated trial to determine whether these offenses occurred within 1000 feet of a school zone. During the second

portion of the trial, Detective Ahne testified that the Defendant's residence was located in an area near Saint Patrick's School, a private school that enrolled children from Pre-K through eighth grade. The school was located 595 feet from the house in which the Defendant was residing. Based upon this evidence, the jury agreed that the Defendant's convictions occurred within 1000 feet of a school zone.

### C. Sentencing Hearing

At the Defendant's sentencing hearing, John McGranahan, a probation and parole officer, testified that he prepared the presentence investigative report in this case. He testified that the Defendant had previously been convicted of eight felonies: three counts of burglary, two counts of felony theft, and three counts of selling marijuana. Officer McGranahan testified that the Defendant had been previously sentenced to probation and/or community corrections on "many" occasions and that she had frequently violated those sentences.

Based upon this evidence, the trial court found:

In determining the appropriate sentence the legislature has set out certain things the court has to consider in announcing the sentence, including the evidence presented at trial and the sentencing hearing, the presentence report, the principles of sentencing and arguments made as to alternatives, the nature and characteristics involved, any evidence and information offered by the parties on mitigating and enhancement factors. . . . The defendant's potential for rehabilitation or treatment.

In Count II of the indictment, which is the cocaine possession with intent [to sell] within a school zone, the court finds that in that count the [D]efendant is a range one standard offender. In Count I, the possession of marijuana for resale, is a Class D felony and the [D]efendant is a multiple offender in Count I.

The court finds enhancing factors that the [D]efendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. That's enhancement factor (1). Enhancement factor (8) is that the [D]efendant has failed to comply with the conditions of sentencing involving release into the community. The court's also considered the considerations for consecutive sentencing, mandatory consecutive sentencing, which is not applicable in this case, and all the probation considerations.

The sentencing range for the Class A felony is 15 to 25 years. The sentence for a multiple offender, Class D, is four to eight years. The Class A sentence, the court finds that it should be enhanced because of the enhancing factors to the middle range, sentences the [D]efendant to 20 years as a range one standard offender; and then the D felony, the court enhances to six years. These sentences will be served concurrently.

It is from these judgments of the trial court that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied her motion to suppress because the attachment order upon which she was arrested was unlawfully issued; (2) the trial court erred when it denied her motion to set aside her verdict because she was not properly charged with the crimes for which she was convicted; (3) she was denied due process of law because the presiding trial judge had previously prosecuted her for burglary and felony theft charges; (4) she was denied due process of law because the Assistant District Attorney who prosecuted her case had previously been her public defender when she was convicted of burglary and felony theft charges; and (5) the trial court erred when it enhanced her sentence.

### A. Motion to Suppress

The Defendant contends that the trial court erred when it denied her motion to suppress. She argues that the attachment order was not lawfully issued because it does not establish or even allege a "willful disobedience" as required by statute. The State counters that the trial court correctly denied the motion to suppress based upon its finding that the attachment order was lawfully issued after the Defendant failed to appear in court on the rescheduled date of a summons in a child support matter. We agree with the State.

The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23; *see State v. Randolph*, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom*, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* This Court, however, reviews the trial court's application of the law

to the facts de novo, without any deference to the determinations of the trial court. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. *Odom*, 928 S.W.2d at 22-23; *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Defendant's motion to suppress was based upon her allegation that the attachment warrant in her case was not lawfully issued. The juvenile court issued the attachment warrant pursuant to Tennessee Code Annotated section 29-9-102 (2000). That code section provides:

> The power of the several courts to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:
>
> (1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;
>
> (2) The willful misbehavior of any of the officers of such courts, in their official transactions;
>
> (3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts;
>
> (4) Abuse of, or unlawful interference with, the process or proceedings of the court;
>
> (5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or
>
> (6) Any other act or omission declared a contempt by law.

T.C.A. § 29-9-102 (2000).

Contempts may be either criminal or civil in nature. Civil contempt occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights. *Black v. Blount*, 938 S.W.3d 394, 398 (Tenn. 1996) (citing *Robinson v. Air Draulics Engineering Co.*, 377 S.W.2d 908, 911 (1964)). If imprisonment is ordered in a civil contempt case, it is remedial and coercive in character, designed to compel the contemnor to comply with the court's order. *Id.* Compliance will result in immediate release from prison. Therefore, it has often been said that in a civil contempt case, the contemnor

"carries the keys to his prison in his own pocket . . . ." *Id.* (citing *State ex rel. Anderson v. Daugherty*, 191 S.W. 974 (1917)).

Criminal contempts, on the other hand, are intended to preserve the power and vindicate the dignity and authority of the law, and the court as an organ of society. *Id.* (citing *Daugherty*, 191 S.W. at 974; *Gunn v. Southern Bell Tel. & Tel. Co.*, 296 S.W.2d 843, 844-45 (1956)). Therefore, sanctions for criminal contempt are generally both punitive and unconditional in nature. *Id.* While criminal contempts may arise in the course of private civil litigation, such proceedings "in a very true sense raise an issue between the public and the accused." *Id.* (citing *Daugherty*, 191 S.W. at 974). In the trial of a criminal contempt case, therefore, guilt of the accused must be established by proof beyond a reasonable doubt. *Id.* (citing *Robinson*, 377 S.W.2d at 912).

In the case under submission, the juvenile court's issuance of the attachment was not a finding that the Defendant was in contempt of court but rather a show cause order for her to appear and explain why the court should not find her in contempt. The juvenile court judge explained that he issued this order upon his belief that the Defendant had failed to appear for a scheduled hearing. He said that, had the Defendant not been present when he scheduled the hearing, he would have reset the hearing rather than issued an attachment order. The judge further stated that other facts in the record supported the proposition that the Defendant was present when he scheduled the hearing that the Defendant later missed. We conclude that the trial court did not err when it concluded that the juvenile judge lawfully issued the attachment order.

Further, even if the attachment were unlawfully issued, the officers gained entry into the house by permission of someone inside the house. *State v. Bartram*, 925 S.W.2d 227, 230-31 (Tenn. 1996). The owner of the house also gave the officers permission to search the house. As the owner, and also a co-resident of the house, the owner had the lawful authority to consent to the search. *State v. Ellis*, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000) (holding that in most circumstances, valid consent exists when given "either by the individual whose property is searched or by a third party who possesses common authority over the premises."); *see also United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) (stating it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched). This consent was separate and apart from the consent the Defendant gave to the officers. For these reasons, we conclude that the trial court did not err when it denied the Defendant's motion to suppress.

## B. Indictment

The Defendant next contends that the trial court erred when it failed to set aside her verdicts for uncharged crimes. She states that her indictment alleged she "possessed a contraband substance with intent to manufacture, deliver or sell the controlled substance." The jury foreman, however, stated that the jury had found her guilty of "attempt to sell and deliver 13 grams of cocaine" and "on the charge of selling and delivering 38.3 grams of marijuana, [] guilty." Accordingly, she asserts the jury did not find that she was guilty of "possession" for either charge. The State counters that the trial court properly instructed the jury on the offenses in the indictment and that the record shows that it convicted her of those offenses. We agree with the State.

At the conclusion of the first portion of the trial, the following colloquy occurred:

THE COURT: What is your verdict?
MR. FOREMAN: Count I, on the attempt to sell and deliver 13 grams of cocaine, we find the defendant guilty.
THE COURT: All right.
MR. FOREMAN: Count II –
THE COURT: Count II was cocaine.
MR. FOREMAN: That paper, I thought it was the other way around. Anyway, on the charge of selling and delivering 38.3 grams of marijuana, found the defendant guilty.

The trial court then confirmed that the each of the jury members agreed with this verdict. The Defendant's counsel asked that they be polled, and each juror confirmed the verdict. The trial court then stated, "Members of the jury, you've determined that the defendant is guilty as charged in the indictment."

The Defendant moved to set aside the verdict based upon a variance between the verdict and the indictment. The trial court stated, "the way he phrased that, at least in the first part, it's pretty clear that they convicted her of intent to sell or deliver[.]" At the hearing on the motion for new trial, the trial court said that it understood the verdict to be that the "defendant was guilty of the crime charged in the indictment, that was the court's understanding from the announcement by the foreman." The trial court recognized that the Defendant's counsel may have understood it differently but reiterated that the trial court understood the foreman to be saying the Defendant was guilty of the offenses listed in the indictment. The trial court stated on the record that the jury had not used a jury verdict form in the Defendant's case.

"A jury verdict must be in language which is clear and certain as to its meaning and which cannot be mistaken." *State v. Jason White*, No. W2003-02558-CCA-R3-CD, 2005 WL

729167, at *7 (Tenn. Crim. App., at Jackson, March 30, 2005) (citing *State v. Smith*, 836 S.W.2d 137, 143 (Tenn. Crim. App. 1992) and *Baldwin v. State*, 213 Tenn. 49, 372 S.W.2d 188 (Tenn. 1963)), *perm. app. denied* (Tenn. Oct. 10, 2005).

Our Supreme Court has observed,

> Since the reception of a verdict is not solely a ministerial as distinct from a judicial act, when the jury return [sic] into court with a verdict, it is not a matter of course to receive it in the form in which it is rendered. It is the duty of the Court . . . to look after its form and substance, so far as to prevent an unintelligible, or a doubtful, or an insufficient verdict from passing into the records of the court.

*Id.* (citing *State v. Henley*, 774 S.W.2d 908, 915 (Tenn. 1989)). If the trial court finds a jury's verdict to be unclear or doubtful, the trial court has the power and the duty to send the jury back to the jury room with directions to amend the verdict and put it in proper form. *Smith*, 836 S.W.2d at 143. A verdict that contains some ambiguity may be more clear when viewed in the context of the instructions. *Id.*

In the case under submission, we conclude that the verdict was neither incomplete nor imperfect. Although the jury foreman articulated the jury's verdict inartfully, we agree with the trial court that the circumstances surrounding the verdict made it clear that the jury convicted the Defendant of the offenses charged. The trial court instructed the jury on the crimes of possession of marijuana with the intent to sell and possession of cocaine with the intent to sell. The trial court also instructed the jury on the offenses of possession of marijuana and cocaine. There was no evidence submitted that the Defendant did, in fact, sell the drugs found in the house. The evidence presented was circumstantial evidence that she intended to sell the drugs. The evidence supporting this intent included the extra baggies found with the drugs, the scales, and the torn baggie that indicated that some drugs had been packaged in a portion of a baggie for sale. The jury returned a verdict indicating that it believed that the Defendant intended to sell or deliver the drugs that were found in her possession. As the trial court stated, the jury convicted the Defendant "as charged in the indictment." The Defendant is not entitled to relief on this issue.

### C.  Judge Disqualification

The Defendant next contends that she was denied due process of law because the presiding trial judge had previously prosecuted her for burglary and felony theft charges. She states that the judge should have disqualified himself because his impartiality was in question based upon his past prosecution of her. The State counters that the Defendant did not call this

issue to the trial court's attention until sentencing and that the trial court did not abuse its discretion by declining to disqualify himself. We agree with the State.

A motion to recuse is addressed to the sound discretion of the trial court and will not be reversed unless "clear abuse" appears on the face of the record. *Owens v. State*, 13 S.W.3d 742, 757 (Tenn. Crim. App. 1999) (citations omitted). Tennessee Supreme Court Rule 10, Canon 3(E)(1)(a) and (b) provides as follows:

> (1) A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> > (a) the judge has a personal bias or prejudice concerning a party . . . or personal knowledge of disputed evidentiary facts concerning the proceeding;
> >
> > (b) the judge served as a lawyer in the matter in controversy . . . or the judge has been a material witness concerning it.

Article VI, § 11 of the Tennessee Constitution provides that a judge should not preside over a trial "in which he may have been of counsel, . . . except by consent of all parties." Similarly, Tennessee Code Annotated section 17-2-101(3) requires recusal when the judge "[h]as been of counsel in the cause" except by consent of all the parties.

The Defendant has presented no evidence to demonstrate the trial judge's alleged bias or prejudice, and the Defendant makes no specific allegations of impartiality other than the fact that the trial judge was the prosecuting attorney for one of her prior convictions. The record evidences that the trial judge in this case had been a prosecutor in Humphreys County in 1991. He prosecuted one of the Defendant's 1991 cases, which resulted in the Defendant pleading guilty. There is no evidence that the trial judge recalled prosecuting the Defendant, and the Defendant's counsel was unaware of this fact until shortly before the Defendant's sentencing hearing when the Defendant's counsel inspected the judgments of conviction from the Defendant's previous convictions and saw the trial judge's name listed as the prosecutor. During sentencing, the trial judge used the Defendant's six prior convictions, including the one that he prosecuted, to apply enhancing factor (1), that the Defendant had a history of criminal convictions or criminal behavior in addition to that necessary to establish her range. There were no evidentiary facts in dispute concerning the prior conviction prosecuted by the trial judge. The only issue relating to the prior conviction was that it, along with the Defendants' other felony convictions, was used to enhance her sentence, which was purely

a question of law.  There is nothing in the record to indicate that the trial judge was subjectively unfair or partial.

We must also consider, however, whether recusal was objectively required.  *See State v. Conway*, 77 S.W.3d 213, 225 (Tenn. Crim. App. 2001) (citing *State v. Connors*, 995 S.W.2d 146, 149 (Tenn. Crim. App. 1998) (requiring judge to not only examine "subjective bias," but also whether impartiality might be reasonably questioned under an "objective standard") and J. Shaman et al, *Judicial Conduct and Ethics* § 4.01, p. 109 (3d ed. 2000) (Judges should "look to an external standard in addition to their subjective feelings to decide if disqualification is necessary.  It thus takes into account that disqualification is required if there is an appearance of partiality to the reasonable observer, and it precludes a judge from avoiding recusal merely by avowing his or her impartiality.")).

The Defendant herein claims that the trial judge's participation as a prosecutor in her prior conviction precluded his participation in the current trial, especially since her prior conviction was used to enhance her sentence.  In *State v. Warner*, 649 S.W.2d 580, 582 (Tenn. 1983), our Supreme Court held that the Tennessee Constitution did not require recusal where the judge was the District Attorney when defendant was convicted of two of the underlying offenses charged in the habitual criminal indictment.  Additionally, the Supreme Court has limited the scope of Canon 3(E)(1)(b) to "the cause on trial . . . and not . . . prior concluded trials . . . ."  *State v. Smith*, 906 S.W.2d 6, 12 (Tenn. Crim. App. 1995) (citing *Warner*, 649 S.W.2d at 581); *see Leonard Smith v. State*, 357 S.W.3d 322, 341-42 (Tenn. 2011).  The rationale of *Warner* and *Smith* also apply to the case under submission.  Here, the judge was involved as a prosecutor in a prior concluded trial that occurred nineteen years before the Defendant was tried in this case.  The Defendant pled guilty in that case, and there are no disputed facts about her conviction.  Thus, we conclude that neither the Tennessee Constitution, Tennessee Code Annotated section 17-2-101(3), nor Canon 3(E)(1) mandated that the trial judge recuse himself.  The Defendant is not entitled to relief on this issue.

### D.  Assistant District Attorney Disqualification

The Defendant next contends that she was denied due process of law because the Assistant District Attorney who prosecuted her had previously acted as her public defender when she was charged with burglary and felony theft.  She explains that she was convicted of both offenses and that both of these convictions were used by the State when it sought to have her sentences for the convictions in this case enhanced.  The State counters that, since there was no evidence that the prosecutor used or even remembered any client confidences in employing matters of public record at sentencing, there was no prejudice, and the Defendant's due process rights were not violated.  We agree with the State.

Initially, we note that improper or unethical participation by a prosecutor or a prosecutor's office in a criminal case may implicate the basic constitutional rights of a defendant, "the orderly administration of justice, the dignity of the courts, the honor and trustworthiness of the legal profession[,] and the interests of the public at large . . . ." *State v. Phillips*, 672 S.W.2d 427, 435 (Tenn. Crim. App. 1984); *see also State v. Coulter*, 67 S.W.3d 3, 28-29 (Tenn. Crim. App. 2001). In protecting these concerns, Tennessee courts generally turn for guidance to our Code of Professional Responsibility, as adopted by our supreme court in Tennessee Supreme Court Rule 8, and to court-created principles of professional conduct. *Coulter*, 67 S.W.3d at 28. A trial court's application of these legal standards to a disqualification motion will not be disturbed on appeal absent an abuse of discretion. *Id.* (citing *State v. Culbreath*, 30 S.W.3d 309, 313 (Tenn. 2000) and *State v. Tate*, 925 S.W.2d 548, 549-550 (Tenn. Crim. App. 1995) (other citations omitted)). An abuse of discretion might comprise the application of an incorrect legal standard or a decision that is against logic or reasoning and that caused an injustice to the complaining party. *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999); *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997). In determining whether the trial court has applied an incorrect legal standard, "'appellate courts are not required to defer to a trial court's interpretation of the Code of Professional Responsibility or to its decisions regarding legal standards applicable to a particular disqualification motion.'" *Coulter*, 67 S.W.3d at 28 (citations omitted).

For purposes of deciding whether a prosecutor or his office should be disqualified from participation in a criminal case, this Court and our Supreme Court have adopted the following analytical framework: (1) Do the circumstances of the defendant's case establish an actual conflict of interest that requires the disqualification of a prosecutor? (2) Do the circumstances of the defendant's case create an appearance of impropriety that requires the disqualification of a prosecutor? (3) If either theory requires the disqualification of a prosecutor, is the entire District Attorney General's office likewise disqualified? *Id.* (citations omitted).

It is settled law that once an attorney has been engaged and received the confidences of a client, the attorney cannot enter the services of those whose interests are adverse to the client or former client. Thus, an attorney will not be permitted to prosecute a criminal case if, through previous representation of the defendant, he has obtained information upon which the prosecution is predicated. *Phillips*, 672 S.W.2d at 427.

The case under submission is not one in which the prosecutor "switched sides." *See Coulter*, 67 S.W.3d at 33. There is no evidence in the record that the prosecutor remembered having previously acting as the Defendant's public defender eighteen years before the current prosecution. Further, there is no evidence that the prosecutor obtained information through her previous representation that had any bearing on these convictions. The Defendant even limits her contention to the fact that the prosecutor elicited testimony about the prior

convictions when arguing that her sentence should be enhanced. There was, however, no dispute about the facts underlying those convictions, and the convictions were used in combination with others to support that the Defendant had a previous history of criminal convictions in addition to those necessary to establish her range. We conclude that, considering these circumstances, the trial court did not err when it denied the Defendant's motion to have the prosecutor disqualified before sentencing and when it denied her motion for new trial on this ground. The Defendant is not entitled to relief on this issue.

### E. Sentencing

Finally, the Defendant contends that the trial court erred when it enhanced her sentence. She asserts that the trial court improperly applied both enhancing factors. First, while she concedes that she had several previous felony convictions, she asserts that these convictions "do not warrant enhancement [factor (1)]." Further, she asserts that her failure to comply with conditions of sentences involving release into the community is "irrelevant to a Class A school zone conviction wherein the Department of Correction has no authority to release such a convict into the community for another 15 years." She further states that "[e]nhancement factor (8) is not . . . appropriate for . . . a Class A school zone offense." The State counters that the trial court properly enhanced the Defendant's sentence. We agree with the State.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2010). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2010). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, the appellate court may not disturb the sentence even if a different result was preferred. T. C A. § 40-35-103 (2010); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed

sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). The trial court classified the Defendant in this case as a Range I, standard offender, for her Class A felony conviction and a Range II, Multiple Offender, for her Class D felony conviction. *See* T.C.A. § 40-35-105(a) - 106(a) (2010). The applicable sentencing range for the Class A felony was between fifteen and twenty-five years. *See* T.C.A. § 40-35-112(a)(1) (2010). The applicable sentencing range for the Class D felony conviction was between four and eight years. *See* T.C.A. § 40-35-112(b)(4) (2010).

The Tennessee Code allows a sentencing court to consider the following enhancement factors, as relevant to this case, when determining whether to enhance a defendant's sentence: "(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" and "(8) The defendant, before trial or sentencing, failed to comply with the condition of a sentence involving release into the community." T.C.A. § 40-35-114(1), (8) (2010). If an enhancement factor is not already an essential element of the offense and is appropriate for the offense, then a trial court may consider the enhancement factor in its length of sentence determination. T.C.A. § 40-35-114 (2010). In order to ensure "fair and consistent sentencing," the trial court must "place on the record" what, if any, enhancement and mitigating factors it considered as well as its "reasons for the sentence." T.C.A. § 40-35-210(e) (2010). Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors it found to apply to the defendant. T.C.A. § 40-35-401(b)(2) (2003). The 2005 amendments deleted as grounds for appeal, however, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8-9. In summary, although this Court cannot review a trial court's weighing of enhancement factors, we can review the trial court's application of those enhancement factors. T.C.A. § 40-35-401(d) (2010); *Carter*, 254 S.W.3d at 343.

We conclude that the trial court properly applied enhancement factor (1) to both of the Defendant's sentences. The Defendant had eight previous felony conditions that occurred on four separate occasions, in addition to other misdemeanor convictions. The trial court, therefore, properly applied this enhancement factor.

We similarly conclude that the trial court properly applied enhancement factor (8) to both of the Defendant's convictions. The record shows that the Defendant has violated multiple probationary and community corrections sentences. We find unpersuasive the Defendant's argument that enhancement factor (8) is not an appropriate enhancement factor for a Class A school zone offense. First, the Defendant cites no law to support her contention. Further, the applicable statutes make no mention that this enhancement factor is not applicable to this conviction. Finally, it stands to reason that one who fails to comply with a sentence

involving release into the community, only to commit a subsequent Class A felony offense, should suffer a greater penalty than a first time offender. We conclude the trial court properly sentenced the Defendant and that she is not entitled to relief on this issue.

### III. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE